AJAX HARDWARE MANUFACTURING
CORPORATION, Plaintiff-Appellant,

v.

INDUSTRIAL PLANTS CORPORATION,
Defendant-Appellee.

No. 32, Docket 75–7663.

United States Court of Appeals,
Second Circuit.

Argued Oct. 21, 1976.

Decided July 13, 1977.

Rehearing Denied August 16, 1977.

Murray Gartner, New York City (Edward A. Brill, and Poletti Freidin Prashker Feldman & Gartner, New York City, on the brief), for plaintiff-appellant Ajax Hardware Mfg. Corp.

Arnold C. Stream, New York City (Robert G. Smith, and Monasch Chazen & Stream, New York City, on the brief), for defendant-appellee Industrial Plants Corp.

Before SMITH, OAKES and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

In this diversity action plaintiff Ajax Hardware Manufacturing Corporation (Ajax) sought to recover from defendant Industrial Plants Corporation (Industrial) damages for breach of contract, negligence and fraud arising from Industrial's performance under a contract to appraise certain machinery for Ajax.

There have been two jury trials in the Southern District of New York before Richard H. Levet, *District Judge.* Ajax appeals (1) from an order entered after the first trial denying its motion for judgment n. o. v. or a new trial limited to the issue of damages, but granting on the ground of an improper compromise verdict Industrial's motion for a new trial on all issues; and (2) from a judgment dismissing the complaint entered upon a verdict for Industrial returned at the second trial.

We hold that a new trial on all issues was properly ordered after the first trial, but that at the second trial the court erred in dismissing Ajax's claims for negligence and fraud and in restricting the scope of its claim for breach of contract. Accordingly, we reverse and remand for a third trial.

## I. FACTS

In August 1966 Ajax was negotiating with the United States government for a $3,500,000 contract to manufacture time fuses. In order to perform the contract Ajax required a subcontractor which had light precision watchmaking equipment. Time & Micro Instruments, Inc. (T&M) had such a facility which was lying idle. Ajax, contemplating either a subcontractor or a joint venture, entered into negotiations

with T&M. Since the latter could not participate without an infusion of cash, the deal was to include a $350,000 loan from an institutional lender to T&M. Ajax, secured by the machinery at the T&M plant, was to guarantee T&M's obligation.

In anticipation of a commitment to guarantee the loan to T&M, Ajax engaged Industrial to appraise the machinery at the T&M plant. Ajax acted through its Vice President, Howard Klein. On August 12 Klein concluded an oral agreement with Industrial's Vice President, Jesse Thaler. The terms of this agreement give rise to the principal factual question in the case. According to Klein, he informed Thaler that Ajax intended to guarantee a loan and wanted to know whether the T&M machinery would be adequate security. Klein testified that he told Thaler that Ajax "wanted to know the forced liquidation value of the equipment in case there was a default on the loan. . . ." According to Thaler, Klein requested an appraisal based on the market value of the plant in place, intact and ready for operation—not based on the forced liquidation value of the individual machines.

Thaler inspected the T&M plant on August 15 and telephoned a preliminary evaluation to Klein. According to Klein, Thaler reported fair market value of approximately $900,000 and a forced liquidation value of $500,000. Klein requested a confirming telegram which Thaler sent on August 17. The telegram stated that the machinery and equipment had a "fair market value" of $919,072 and an additional "in place value" of $137,806, for a "total in place value" of the plant of $1,056,878. The telegram further stated that "[w]hile it is difficult to project market values for the next two years it is inconceivable that the value of this plant would be less than 60 percent of the appraised figure." The telegram further stated that the machinery was of Swiss manufacture and difficult to obtain in this country; that delivery of equivalent machinery required two or three years; that manufacturers would pay premiums to procure an existing plant; and that prices on the general "machinery market" were high at that time.

Industrial sent a formal appraisal report and letter to Ajax on August 19 which reiterated the substance of its telegram of August 17 in all material respects. The appraisal was received by Ajax on August 22. It set forth a list of each piece of machinery with an individual dollar value for each. The sum of these individual valuations was substantially in accord with the figures stated in the August 17 telegram.

On August 18 Ajax signed a commitment to obtain and guarantee a $270,000 loan to T&M. Under the agreement Ajax had until September 9 to perform or to cancel and pay a $20,000 penalty. Ajax performed, secured by the machinery appraised by Industrial. T&M later defaulted. A subsequent "forced sale" of the plant equipment at auction netted only $144,000. As a result, Ajax had to repay the lender $163,-270.70, the unpaid balance of the $270,000 T&M loan after application of the $144,000 proceeds from the sale. Ajax's explanation for the discrepancy between the $144,000 figure and the values reported by Industrial is that in 1966 the watchmaking industry in this country was moribund; in fact no market existed for the T&M machinery.

Ajax commenced the instant diversity action on May 5, 1969 against Industrial to recover the resulting $161,895.75 deficiency on its T&M guaranty, i. e. $163,270.70 less certain adjustments. Ajax alleged breach of contract, negligence and fraud on the part of Industrial in rendering its appraisal.

## II. FIRST TRIAL

The first trial began on April 23, 1975 and was concluded on May 1, 1975 when the jury returned a $70,000 verdict in favor of Ajax on its negligence claim and a verdict against Ajax on its contract and fraud claims. Ajax made a motion to set aside the $70,000 verdict in its favor, requesting either that judgment be entered n. o. v. in amount of $161,895.75 or that there be granted a new trial limited to the issue of damages. Industrial moved that the entire verdict be set aside and for a new trial on

all issues on the alternative grounds that the $70,000 verdict was against the weight of the evidence or an improper compromise between liability and damages. Both parties argued that if Ajax was entitled to damages at all it was entitled to the liquidated sum of $161,895.75. Judge Levet, focusing on the jury's return of a verdict which fell substantially below that liquidated sum, held that the verdict was a compromise one and granted Industrial's motion for a new trial on all issues.

■ The facts as stated present the very situation out of which an inference of a compromise verdict most readily arises. As we said in *Maher v. Isthmian Steamship Co.*, 253 F.2d 414, 416–17 (2 Cir. 1958), the inference of a compromise stems from an inconsistency between the verdict and the facts adduced at trial, and "[s]uch an inconsistency is most clearly apparent when the plaintiff sues for a liquidated sum . . . where the only defense is denial of the obligation, and the verdict for the plaintiff is in an amount substantially less than that claimed." But a compromise on the issue of liability is not the only reasonable explanation for the instant $70,000 verdict. Judge Levet instructed the jury on compensatory damages as follows: "If you should find that the plaintiff is entitled to compensatory damages, your award *cannot exceed* the total sum claimed for such damages, which is $161,895.75." (emphasis added). The jury might well have understood this to mean that it was permissible to award any sum that did not exceed the stated limit.[1]

■ Ajax contends that the district court's finding of a compromise verdict must be reviewed in the light of the *Maher* formulation: "[T]he record itself viewed in its entirety must clearly demonstrate the compromise character of the verdict . . . ." 253 F.2d at 419. See also *Great Coastal Express, Inc. v. International Brotherhood of Teamsters*, 511 F.2d 839, 846 (4 Cir. 1975). Recognizing the correctness of the *Maher* rule in an appropriate case, we do not believe that this is such a case—for the simple reason that such a demonstration on the entire record is not feasible here. While a compromise may have occurred, there is an equally reasonable and perhaps even better explanation which involves no jury misconduct. In short, we hold that the new trial cannot be sustained on the ground upon which the district court granted it.

The order for a new trial, however, can be sustained on a different ground. *Maher* and its successor, *Bartholomew v. Universe Tankships, Inc.*, 263 F.2d 437 (2 Cir.), cert. denied, 359 U.S. 1000 (1959), were cases in which it was contended that juror misconduct had tainted otherwise legally sustainable damage awards. Here, however, the verdict might well have been set aside on the ground of inadequacy. In view of the parties' agreement that the damages were liquidated and absent any support in the record for the $70,000 award, failure to have set aside the verdict would have been an abuse of discretion. See *Caskey v. Village of Wayland*, 375 F.2d 1004, 1007–08 (2 Cir. 1967). The issue here in our view is the propriety of the district court's decision between the three alternatives urged by the parties in their motions—judgment n. o. v.

1. Ajax contends that any inference of a compromise verdict is negated by the sequence of the jury's deliberations.

After 4 hours of deliberations, the jury sent a note to Judge Levet stating that it could not reach agreement on the contract claim but had reached agreement on fraud, negligence and damages. Judge Levet reported to counsel that the jury was unable to reach agreement, but did not inform counsel that agreement had been reached on 4 of the 5 special verdict questions. He then instructed the jury to continue its deliberations, adding that he did not want to see a mistrial. The jury returned its verdict 15 minutes later.

We fail to see how the jury's inability to agree on the contract claim until 15 minutes before returning its verdict conclusively rebuts the inference of a compromise. Ajax argues that, if a compromise had occurred at the earlier point when the jury decided Industrial was liable for negligence, it hardly would have continued deliberating on the contract claim. While this is not an unreasonable inference, others are equally permissible—including inferences of one or more compromises. As Judge Medina observed in *Maher v. Isthmian Steamship Co., supra*, 253 F.2d at 419, "one inference is as good as another" in this kind of situation.

in the liquidated sum of $161,895.75, a new trial limited to the issue of damages, or a new trial on all issues.

A new trial limited to the issue of damages requested by Ajax would have been a proper remedy only if the district court had been satisfied that the jury properly determined the issue of liability. See 6A Moore's Federal Practice ¶ 59.06, at 59–80 to 59–83 (2d ed. 1974); *Scheurholz v. Roach*, 58 F.2d 32, 33–34 (4 Cir.), *cert. denied*, 287 U.S. 623 (1932).[2] As with any other jury impropriety, evidence of a compromise verdict must be considered in making this determination. For example, in *Hatfield v. Seaboard Air Line R. Co.*, 396 F.2d 721 (5 Cir. 1968), a jury had returned a one dollar verdict for the plaintiff despite uncontroverted evidence of substantial physical injuries. The Fifth Circuit set aside the verdict for inadequacy and ordered a new trial on all issues, pointing to "some kind of jury impropriety" and mentioning a compromise as a possibility. The court stated that the case was not one where an "erroneous damage finding *clearly had no effect* on the findings of liability." (emphasis added). 396 F.2d at 724.

■ Although the facts in the instant case are not as extreme as those in *Hatfield*, the conflicting inferences from the record make this a case in which it cannot be said that there "clearly" was no relationship between the jury's finding of liability and the inadequate damage award. Bearing in mind the district court's discretion in choosing between a partial and a complete new trial, 6A Moore's Federal Practice, *supra* ¶ 59.06, at 59–80, we hold that the reasonable possibility of a compromise verdict warranted a new trial on all issues.[3]

2. Nor can the questions of liability and damages be so interwoven that a second jury could not fairly consider damages alone. *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 500 (1931). In the instant case liability and damages were readily severable questions.

3. Cf. *Edwards v. Sears, Roebuck and Co.*, 512 F.2d 276, 282–83 (5 Cir. 1975); 6A Moore's Federal Practice, *supra*, ¶ 59.05[3], at 59–59.

## III.  SECOND TRIAL

### (a) *Negligence and Fraud Claims*

At the conclusion of Ajax's case at the second trial on October 23, 1975, the district court, on motions for a directed verdict by Industrial, dismissed Ajax's negligence and fraud claims, holding that the negligence claim was "completely merged in the alleged breach of contract" and that the evidence of fraud was insufficient. We hold that the dismissal of these claims was erroneous.

■ Negligent performance of a contract may give rise to a claim sounding in tort as well as one for breach of contract. See Prosser, The Law of Torts § 92 (4th ed. 1971); Restatement (Second) of Torts §§ 323, 324A (1965). The two claims may be submitted as alternatives to the jury, as a matter of both New York substantive law, *Victorson v. Bock Laundry Machine Co.*, 37 N.Y.2d 395, 335 N.E.2d 275, 373 N.Y.S.2d 39 (1975), and federal procedural law. Fed.R.Civ.P. 8(e)(2).

■ Industrial contends that regardless of any merger of claims Ajax failed to sustain its burden of proving negligence. It argues that a fair market value appraisal was made; that Ajax knew that a fair market value appraisal had been received; and therefore that Ajax could not possibly have relied upon the appraisal in committing itself to the T&M guaranty. Industrial also emphasizes Ajax's failure to prove the individual figures in the appraisal to have been erroneous reflections of fair market value.

This argument, which more appropriately should be addressed to a jury, ignores the evidence Ajax did adduce. On the basis of

While this is not the ground upon which Judge Levet granted a new trial, Industrial made it the basis for one of its motions and argued it on appeal. As the Supreme Court noted in *Dandridge v. Williams*, 397 U.S. 471, 475 n. 6 (1970): "The prevailing party may, of course, assert in a reviewing court any ground in support of his judgment, whether or not that ground was relied upon or even considered by the trial court."

Klein's testimony the jury could have found that Industrial contracted to make an appraisal of forced sale as well as fair market value and that it did so. Having so found, there was evidence from which the jury could have further found both the breach of a duty of care and a causal connection between it and Ajax's injury without having to rely upon the fair market value figures. Ajax moreover did raise a jury question regarding the fair market value figures by showing Industrial's failure to research the assumptions upon which they were based and by showing the depressed conditions in the watch machinery market.

■ In dismissing Ajax's fraud claim, Judge Levet correctly held that it had a burden to produce "clear and convincing" evidence. *Manchel v. Kasdan*, 286 App.Div. 483, 144 N.Y.S.2d 694 (1st Dept.1955) (per curiam); *Cave v. Green*, 281 App.Div. 560, 120 N.Y.S.2d 865 (1st Dept.1953), *aff'd*, 308 N.Y. 754, 125 N.E.2d 109 (1955). New York imposes a burden of proof for fraud "far more demanding" than that for breach of contract or negligence. *JoAnn Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 250 N.E.2d 214, 302 N.Y.S.2d 799 (1969). We hold that Judge Levet erred in finding that Ajax failed to meet this burden.

■ Ajax grounded its fraud claim on two misrepresentations by Industrial. The first was Industrial's statement, based mostly on the informal comments of an Ajax employee, that the T&M machinery was scarce and in demand. The second was Industrial's statement that it had applied its independent professional judgment to the job, when in fact it had used an earlier appraisal as the basis for its appraised figure.

We believe that the jury could have found that these statements were false, that they were material and that Ajax relied on them to its detriment. The weak link here of course is the proof of scienter. Since Industrial had some basis, however slight, for the statements in its report, the evidence might be viewed as failing to support an inference of knowing false representation. Under *Hadcock v. Osmer*, 153 N.Y. 604, 47 N.E. 923 (1897), however, it was open to Ajax to show that Industrial's representative was conscious of an insufficient factual basis for his representations. See also *Ultramares Corp. v. Touche, Niven & Co.*, 255 N.Y. 170, 174 N.E. 441 (1931). We hold that the evidence gave rise to an inference of such conscious disregard that applicable professional standards required substantially more investigation into market conditions than was undertaken by Industrial, and that this inference was of sufficient strength to satisfy Ajax's burden of proof on its fraud claim.

(b) *Contract Claim*

■ The district court declined to submit to the jury the full scope of Ajax's breach of contract theories. Ajax relied upon three alternative contract theories: (1) that Industrial had breached a contract to make an appraisal of the machinery's forced sale value; (2) that Industrial had breached a contract the terms of which left the type of appraisal to its professional judgment; or (3) that Industrial, by its negligent performance, had breached a contract for a fair market value appraisal. Only the first theory was submitted to the jury in the charge and special interrogatories.[4]

No legal infirmity compelled the exclusion of either of the latter two theories.[5] Moreover Ajax produced sufficient evidence

4. The jury was instructed to answer the following question in the affirmative before proceeding to any others:
"Has plaintiff . . . proved . . . that on or about August 12, 1966 defendant . . . entered into a contract to appraise the dollar amount which in defendant's opinion could be realized from the sale of individual items of machinery . . . at the Time & Micro plant at a forced liquidation sale?"

5. Ajax adduced evidence of professional guidelines setting standards for appraisers confronted with terms leaving open the type of appraisal. Such evidence precluded any defense of unenforceability for indefiniteness regarding the second contract theory. See 1 Williston on Contracts §§ 42–43 (Jaeger ed. 1957).

to sustain both of them. Klein's testimony directly supported the existence of contract (2). With regard to contract (3), Industrial's failure to research the state of the market and its undisclosed reliance on an earlier appraisal would have supported a claim of negligent performance. Likewise Industrial's representations of a vigorous market for watch machinery would have permitted a jury to find a causal connection between Industrial's negligent performance of a fair market value contract and Ajax's damages, despite Ajax's admission of a need for the different forced sale valuation. If Industrial had performed its contract properly and reported that little or no market existed for the machinery "in place", Ajax might have avoided committing itself to T&M.

We hold that Ajax was entitled to have the jury consider these claims. While the trial court has broad discretion in framing interrogatories for special verdicts pursuant to Fed.R.Civ.P. 49(a), see 9 Wright & Miller, Federal Practice and Procedure § 2508, at 509 (1971), this discretion does not warrant withdrawing from the jury valid theories of recovery upon which a plaintiff has produced sufficient evidence. *Kornicki v. Calmar S.S. Corp.*, 460 F.2d 1134, 1139 (3 Cir. 1972); *National Bank of Commerce v. Royal Exchange Assurance of America, Inc.*, 455 F.2d 892, 898 (6 Cir. 1972).

Reversed and remanded for a new trial.

OAKES, Circuit Judge (concurring):

I concur in the result, noting that by reinstatement of the negligence and fraud claims it is now possible for the plaintiff-appellant to obtain punitive damages.