Gordon E. **ALLEN**, John Currier, James J. Dunne, Leo Fornero, Gerard P. Mandry, Norman K. Matheson, Bruce E. Moore, Nicholas Pallotta and Cochran B. Supplee, Plaintiffs,

v.

**WESTPOINT–PEPPERELL, INC.**, D. Michael Roark, C. Powers Dorsett and Barry F. Shea, Defendants.

No. 90 Civ. 3841 (SAS).

United States District Court, S.D. New York.

Jan. 28, 1997.

Robert J. Hausen, Chadbourne & Parke, L.L.P., New York City, for Plaintiffs.

Francis Carling, Frederick A. Brodie, Winthrop, Stimson, Putnam & Roberts, New York City, for Defendants.

## *OPINION AND ORDER*

SCHEINDLIN, District Judge.

This Opinion addresses plaintiffs' state common law claims for (1) constructive fraud, (2) negligent misrepresentation, and (3) fraudulent omission. Plaintiffs have submitted these claims for the Court's determination based on a bench trial held earlier this year to determine related issues. For the reasons set forth below, I find defendants [1] not liable with regard to plaintiffs' claims.

### Factual Background

Familiarity with the facts of this case will be presumed for the purposes of this opinion as they have been thoroughly discussed by this Court and the Second Circuit during the long course of this litigation. There is no need to recite them here. *See Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 41–44 (2d Cir.1991); *Allen v. WestPoint–Pepperell, Inc.*, 933 F.Supp. 261, 263–268 (S.D.N.Y. 1996); *Allen v. WestPoint–Pepperell, Inc.*, No. 90–3841, 1996 WL 2004, at *1–2 (S.D.N.Y. Jan. 3, 1996); *Allen v. West Point–Pepperell, Inc.*, 908 F.Supp. 1209, 1212–1217 (S.D.N.Y.1995).

### Procedural History

In an Opinion and Order dated November 2, 1995, I held the Cluett Committee had no authority under ERISA to change the discount rate contained in the Cluett Pension Plan. *See Allen v. West Point–Pepperell, Inc.*, 908 F.Supp. 1209, 1222 (S.D.N.Y.1995). "Accordingly, the 5% discount rate printed in the Cluett Pension Plan was never validly changed and was at all relevant times one of the actuarial assumptions 'contained in' the

Cluett Pension Plan for purposes of the EPI Amendment." *Id.* at 1222–23.

On December 11, 1995, the parties agreed to litigate the change of control issue, the mutual mistake and rescission issues and the question of attorneys' fees before reaching the state common law claims now at issue. A bench trial was held to develop a record on which to resolve those issues. In a Memorandum Opinion dated January 3, 1996, I found that, for purposes of the EPI Amendment, a "change of control" occurred on April 5, 1989. In an Opinion and Order dated May 13, 1996, I declined to rescind the Releases signed by plaintiffs on the basis of mutual mistake and granted attorneys' fees to plaintiffs. *See Allen v. WestPoint–Pepperell, Inc.*, 933 F.Supp. 261 (S.D.N.Y.1996).

### Discussion

#### I. ERISA Preemption and Waiver of Preemption

##### A. ERISA Preemption

A threshold question in the instant action is whether ERISA's preemption clause bars plaintiffs from bringing state common law claims to enforce the EPI pension plan.[2] In pertinent part, ERISA's preemption clause provides as follows:

> Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in [ERISA § 4(a)] and not exempt under [ERISA § 4(b)].

ERISA § 514(a), codified at 29 U.S.C. § 1144(a). The legislative history behind the preemption clause makes it clear that Congress intended to supplant all state regulation of employee benefit plans with a uniform federal system.[3] The United States Su-

---

1. Plaintiffs withdrew their claims against defendant Barry Shea by Stipulation of Discontinuance dated January 22, 1997.

2. The EPI plan is a "top-hat" plan that covered only upper-echelon management personnel. Nevertheless, it is subject to ERISA's preemption clause. *See Bigda v. Fischbach Corp.*, 898 F.Supp. 1004, 1015–1016 (S.D.N.Y.1995), *aff'd*, 1996 WL 107342 (2d Cir.1996) (summary affirmation based on other grounds). *See also Bar-*

*rowclough v. Kidder, Peabody & Co., Inc.*, 752 F.2d 923, 936–937 (3d Cir.1985), *overruled in part on other grounds*, 7 F.3d 1110 (3d Cir.1993).

3. U.S. Representative Dent, who sponsored ERISA in the House, stated: "Finally, I wish to take note of what is to many the crowning achievement of this legislation, the reservation to Federal authority the sole power to regulate the field of employee benefit plans. With the preemption of the field, we round out the protection

preme Court has construed ERISA's preemption language as "deliberately expansive, and designed to establish pension plan regulation as exclusively a federal concern." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 46, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987) (quotations omitted). ERISA's preemption clause has also recently been described as "among the broadest that can be found in the law." *See Geller v. County Line Auto Sales, Inc.,* 86 F.3d 18, 22 (2d Cir.1996). *See generally* James F. Jorden et al., *Handbook on ERISA Litigation* § 2.03 (1994) (describing the wide preemptive effect of ERISA on state law).

This Circuit has previously held that a common law fraud claim for misconduct arising from the administration of an ERISA plan may be preempted. In *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270 (2d Cir.1992), a demolition company failed to make required pension fund contributions for a group of "off-the-books" workers. The Second Circuit held the plaintiffs' common law fraud claim on behalf of participants and beneficiaries of the pension plan was preempted on the ground that the claim had "as a critical factor in establishing liability the existence of a plan and duties similar to those imposed by ERISA." *Id.* at 288 (quotation omitted).

■ However, the rule of *Diduck* does not require the preemption of all common law claims arising out of ERISA plans. The intent of Congress in drafting ERISA's preemption clause "was not to foreclose every state action with a conceivable effect upon ERISA plans, but to maintain exclusive federal control over the regulation of such plans." *NYS Health Maintenance Org. Conference v. Curiale,* 64 F.3d 794, 803 (2d Cir. 1995). Holding that ERISA's preemption clause should not be read to contravene the statute's underlying purpose to protect the interests of participants and beneficiaries of employee benefit plans, the Second Circuit recently held that a state common law claim that "seeks to advance the rights and expectations created by ERISA is not preempted

simply because it may have a tangential impact on employee benefit plans." *Geller,* 86 F.3d at 23. In *Geller,* the Second Circuit held that "the essence of the plaintiffs' fraud claim does not rely on the pension plan's operation or management" but rather on defendants' fraudulent misrepresentation of facts relating to a pension plan. *Id.* Where a fraud claim is presented within the context of a pension benefit plan, ERISA does not automatically preempt state common law actions. *Id.*

■ It is impossible to fit plaintiffs' claims within the *Geller* exception to ERISA preemption of state law actions. Here, plaintiffs' common law actions are brought to enforce the terms of the EPI agreement as they existed before plaintiffs signed Releases altering those terms in 1989. The gravamen of plaintiffs' remaining claims is that, in soliciting plaintiffs' signature on the Release forms, defendants' negligently misrepresented material facts, and fraudulently omitted other material facts, thus causing plaintiffs to sign the Releases to their detriment. Plaintiffs are seeking the amount of EPI benefits that they would have received before the Releases were signed. Understood as such, plaintiffs' claims cannot be classified as "tangential" to the EPI plan. Rather they must be seen as what they are: an attempt to enforce the EPI plan under terms most favorable to plaintiffs. I therefore find that ERISA's preemption clause applies to the instant claims.

**B. Waiver of ERISA Preemption**

■ Both parties agree that ERISA's preemption clause is an affirmative defense that may be waived. Defendants agree to waive any such preemption defense. *See* Letter from Defendants to the Court, dated November 21, 1996; Letter from Plaintiffs to the Court, dated November 22, 1996. However, that the parties have agreed to the application of New York common law to resolve the instant claims does not end the inquiry into the question of preemption. The preemptive effect of federal legislation on state law implicates broad questions of federalism that can-

---

afforded participants by eliminating the threat of conflicting and inconsistent State and local regulations." 120 Cong.Rec. 29197 (1974) (quoted in

*Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 99, 103 S.Ct. 2890, 2901, 77 L.Ed.2d 490 (1983)).

not always be dismissed by the consent of litigating parties. *See, e.g., Florida Lime & Avocado Growers v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963) ("The test of whether both federal and state regulations may operate, or the state regulation must give way, is whether both regulations can be enforced without impairing the federal superintendence of the field, not whether they are aimed at similar or different objectives."); *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941) (whether federal legislation preempts a state law turns on whether or not it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."). *See generally* Laurence H. Tribe, *American Constitutional Law* §§ 6–26, 6–27 (2d ed. 1988) (discussing federal limits on state power).

■ The language of ERISA itself does not directly address the question of whether the statute's preemptive effect may be waived. Thus courts have looked to ERISA's legislative history in an attempt to determine Congress's intent regarding this issue. Defendants cite four Circuit decisions that have held ERISA preemption is an affirmative defense and may be waived.[4] *See Wolf v. Reliance Standard Life Ins. Co.,* 71 F.3d 444, 448–449 (1st Cir.1995); *Dueringer v. General Am. Life Ins. Co.,* 842 F.2d 127, 130 (5th Cir.1988); *Gilchrist v. Jim Slemons Imports, Inc.,* 803 F.2d 1488, 1497 (9th Cir. 1986); *Rehabilitation Inst. of Pittsburgh v. Equitable Life Assur. Soc'y,* 131 F.R.D. 99, 101 (W.D.Pa.1990), *aff'd,* 937 F.2d 598 (3d Cir.1991) (affirmed without opinion). These cases hold that ERISA's preemption clause is a choice of law provision, rather than a choice of forum provision.[5]

*Wolf's* holding that the protection of ERISA's preemption clause is waivable was in part grounded in the First Circuit's determination that:

> [T]he interests in uniformity which Congress hoped to serve in ERISA did not extend to permitting defendant corporations, often more sophisticated about

ERISA than individual plaintiffs, to sit on their hands and not claim the [preemption] defense until the last minute. That employers were meant to enjoy the benefits of uniformity did not mean that they could not forego those benefits.

*Wolf,* 71 F.3d at 448 (citations omitted). *Wolf* is also based on precedent. In *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 44–46, 107 S.Ct. 1549, 1551–1552, 95 L.Ed.2d 39 (1987), the Supreme Court concluded that ERISA's preemption clause was modeled after the preemption clause of the Labor Management Relations Act ("LMRA") and that courts should look to LMRA preemption decisions when deciding the scope of ERISA's preemption clause. *Wolf,* observing that the First Circuit previously held that LMRA preemption is waivable in *Sweeney v. Westvaco Co.,* 926 F.2d 29, 40 (1st Cir.) (Breyer, C.J.), *cert. denied,* 502 U.S. 899, 112 S.Ct. 274, 116 L.Ed.2d 226 (1991), determined, a *fortiori,* that ERISA preemption was waivable.

■ The Second Circuit has not ruled directly on the issue of whether LMRA preemption is waivable. However, Chief Judge (now Justice) Breyer's analysis in *Sweeney* is both thorough and persuasive. In fact, *Sweeney's* holding that LMRA preemption is waivable is in part based on the Fifth and Ninth Circuits' holdings that ERISA preemption is waivable. *Id.* at 40 (citing *Dueringer,* 842 F.2d at 130 and *Gilchrist,* 803 F.2d at 1497). These cases lead me to conclude that ERISA's preemption clause was intended as a choice of law provision. Thus understood, it cannot be interpreted to be jurisdictional and non-waivable and defendants may effectively waive their right to raise ERISA's preemption clause in opposition to plaintiffs' state law claims.

## II. Legal Standards Applicable to Plaintiffs' State Common Law Claims

### A. Elements of Plaintiffs' Common Law Actions

Plaintiffs now bring three common law actions against defendants for (1) constructive

---

**4.** The question of whether ERISA preemption is jurisdictional and thus not waivable, or an affirmative defense that may be waived, has not been addressed by the Second Circuit.

**5.** It is well established that choice of forum preemption is not waivable. *See Int'l Longshoremen's Ass'n v. Davis,* 476 U.S. 380, 398–399, 106 S.Ct. 1904, 1916–1917, 90 L.Ed.2d 389 (1986).

fraud, (2) negligent misrepresentation and (3) fraudulent omission. Set forth below is a brief summary of the required elements of each action under the common law of New York.

 Under New York law, constructive fraud may be defined as "a breach of duty which, irrespective of moral guilt and intent, the law declares fraudulent because of its tendency to deceive, to violate a confidence or to injure public or private interests which the law deems worthy of special attention." *Grand Union Mount Kisco Emp. Fed. Cr. U. v. Kanaryk,* 848 F.Supp. 446, 455 (S.D.N.Y. 1994) (quoting *Brown v. Lockwood,* 76 A.D.2d 721, 432 N.Y.S.2d 186, 193 (2d Dep't 1980)). To establish a claim for constructive fraud, plaintiffs must show (1) a confidential or fiduciary relationship [6] exists, or alternatively that one party has superior knowledge not available to the other; (2) a representation of fact which is false; (3) justifiable reliance on such false representation; and (4) detriment as a result of such reliance. *See Callahan v. Callahan,* 127 A.D.2d 298, 514 N.Y.S.2d 819, 821 (1987) (citations omitted). A plaintiff who attempts to establish a *prima facie* case for constructive fraud by establishing the abuse of a fiduciary or confidential relationship need not prove actual knowledge of falsity or scienter. *Id.* (citing, *inter alia, Del Vecchio v. Nassau County,* 118 A.D.2d 615, 499 N.Y.S.2d 765, 768 (2d Dep't 1986); *Brown,* 432 N.Y.S.2d at 193; 24 N.Y.Jur., Fraud and Deceit §§ 2, 17, 109 (1962)).

 The elements of negligent misrepresentation are (1) carelessness in imparting words; (2) upon which others were expected to rely; (3) upon which they did justifiably rely; (4) to their detriment; and (5) the author must express the words directly, with knowledge they will be acted upon, to one whom the author is bound by some relation or duty of care. *See Ultramares Corp. v. Touche, Nevin, & Co.,* 255 N.Y. 170, 174 N.E. 441 (1931) (Cardozo, J.); *Glanzer v. Shepard,*

233 N.Y. 236, 239–241, 135 N.E. 275 (1922) (Cardozo, J.); *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 81–82 (2d Cir.1980) (Friendly, J.), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981). *See also Patell Industrial Machine v. Toyoda Machinery U.S.A.,* 880 F.Supp. 96, 99 (N.D.N.Y.1995) (citing, *inter alia, Mallis,* 615 F.2d at 81).

 New York also recognizes a claim for fraudulent omission. This action is a permutation of the common law action for fraud. As one New York court explained, "nondisclosure is tantamount to an affirmative misrepresentation where a party to a transaction is duty-bound to disclose certain pertinent information." *Callahan v. Callahan,* 127 A.D.2d 298, 514 N.Y.S.2d 819, 821 (3d Dep't 1987). To establish a claim for failure to disclose material information, plaintiffs must show (1) plaintiffs and defendants were party to a contract; (2) defendants had superior knowledge of material facts; (2) that knowledge was not available to plaintiffs; (3) defendants failed to disclose that knowledge to plaintiffs; (4) scienter [7]; (5) that plaintiffs were justifiably deceived by that failure to disclose; and that (6) plaintiffs were damaged as a result of the failure to disclose. *See Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 45–46 (2d Cir.1991); *Callahan,* 514 N.Y.S.2d at 821; *Young v. Keith,* 112 A.D.2d 625, 492 N.Y.S.2d 489, 490–491 (3d Dep't 1985).

## B. Standards of Proof

 It is commonly accepted under New York law that "evidence of fraud is rarely susceptible of direct proof and must ordinarily be established by circumstantial evidence and the legitimate inferences arising therefrom." *Kanaryk,* 848 F.Supp. at 455. *See also Goshen Litho, Inc. v. Kohls,* 582 F.Supp. 1561, 1564 (S.D.N.Y.1983); *Abrahami v. UPC Const. Co., Inc.,* 224 A.D.2d 231, 638 N.Y.S.2d 11, 13 (1st Dep't 1996). Recognizing the ease with which such inferences may be asserted, New York courts

---

6. *Brown,* 432 N.Y.S.2d at 194, further defined the required relationship as one "warranting the trusting party to repose his confidence in the defendant and therefore to relax the care and vigilance that he would ordinarily exercise in the circumstances."

7. The scienter requirement of fraud actions may be satisfied by a showing of "reckless indifference to error". *Skrine v. Staiman,* 30 A.D.2d 707, 292 N.Y.S.2d 275, 276 (2d Dep't 1968), *aff'd,* 23 N.Y.S.2d 946, 298 N.Y.S.2d 727, 246 N.E.2d 529 (1969).

require fraud and constructive fraud to be proven by clear and convincing evidence. *See Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 971 (2d Cir.1987); *Kanaryk,* 848 F.Supp. at 455; *Geler v. National Westminster Bank USA,* 770 F.Supp. 210, 212–213 (S.D.N.Y.1991). This evidentiary standard forbids the awarding of relief "whenever the evidence is loose, equivocal or contradictory". *Abrahami,* 638 N.Y.S.2d at 13 (quotation omitted).

 Negligent misrepresentation is a species of fraud that replaces the required showing of scienter with a showing of negligence. Like actions for fraud, negligent misrepresentation actions typically are based on inference rather than direct evidence. Thus, New York's high standard of "clear and convincing" proof applies to actions for negligent misrepresentation as well as actions for intentional fraud. *See Alice D. v. William M.,* 113 Misc.2d 940, 450 N.Y.S.2d 350, 354 (N.Y.City Civ.Ct.1982). *Cf. Ajax Hardware Mfg. Corp. v. Industrial Plants Corp.,* 569 F.2d 181, 186 (2d Cir.1977) (discussing "clear and convincing" standard required of actions for fraud and citing *Jo Ann Homes at Bellmore, Inc. v. Dworetz,* 25 N.Y.2d 112, 302 N.Y.S.2d 799, 250 N.E.2d 214 (1969); *Manchel v. Kasdan,* 286 A.D. 483, 144 N.Y.S.2d 694 (1st Dep't 1955) (*per curiam*), *aff'd,* 1 N.Y.2d 734, 151 N.Y.S.2d 940, 134 N.E.2d 687 (1956); *Cave v. Green,* 281 A.D. 560, 120 N.Y.S.2d 865 (1st Dep't 1953), *aff'd,* 308 N.Y. 754, 125 N.E.2d 109 (1955)). Similarly, an action for fraudulent omission is a kind of fraud action, *see Young,* 492 N.Y.S.2d at 490–491 (citing 24 N.Y.Jur. Fraud and Deceit § 106, at 159 (1962)), and requires plaintiffs to meet a "clear and convincing evidence" standard of proof.

## III. Determination of Plaintiffs' Claims

### A. Plaintiffs' Allegations

All three of plaintiffs' common law claims arise out of the same set of factual allega-

tions of defendants' wrongdoing, which are briefly summarized here. In the mid–1970's, Cluett Peabody & Co. ("Cluett") agreed with its senior executives to institute an Executive Permanent Insurance Program (the "EPI Program"), under which deferred compensation benefits would be paid to the senior executives.[8] WestPoint–Pepperell, Inc. acquired Cluett in January, 1986. In anticipation of a hostile takeover during November, 1988, WestPoint offered the EPI Program participants the opportunity to subscribe to a favorable change in terms of the agreement, sending each participant an amendment form (the "EPI Amendment"). Each of the plaintiffs signed and returned that form. Under the EPI Amendment, a participant would be entitled to receive from WestPoint lump sum payments in an amount equal to the "actuarial equivalent" of the participant's retirement benefits in the event of a takeover.

The EPI Amendment defined "actuarial equivalent" as an amount having "the same present value as the accrued benefit". To calculate the actuarial equivalent, the EPI Amendment referred to "the actuarial assumptions contained in Cluett's Employee Retirement Plan." That Plan provided:

"Actuarial equivalent" means an amount of equal value when computed on the basis of interest, mortality and other tables as shall be adopted from time to time by the [Cluett Pension] Committee on the advice of the Actuary, the current factors being as specified below:

(1) Mortality table. The ... 1971 Group Annuity Mortality Table projected to 1978.

(2) Interest rate. 5% per annum, compounded annually.

*See Allen,* 945 F.2d at 42.[9]

Plaintiffs allege that in early 1989, defendants' interest in participating in a leveraged

---

**8.** Under the EPI Program, each participant would be entitled to receive 30% of his final base salary for life upon reaching the age of 65, with payments of half that amount made to a designated beneficiary upon the participant's death. *See Allen,* 945 F.2d at 41.

**9.** The process of determining the present value of a future cash flow is often referred to as "discounting" or "capitalizing" an income stream. The most simple formula for approximating the present value of a cash flow one year from now may be expressed:

$$PV = C/(1+R)$$

buy-out of WestPoint motivated them to execute "drastic cost-cutting measures". *See* Plaintiffs' Trial Memorandum at 7. It was at this time that WestPoint's management attempted to reduce the EPI payments by increasing the interest rate to 9.3%, thereby saving WestPoint approximately $4 million dollars. Plaintiffs now maintain "[b]ecause of the serious conflict of interest these events created for WestPoint's executives, they should have exercised extreme care both in addressing the discount rate issue and in communicating with the EPI Participants." *Id.*

Plaintiffs base their common law actions on the combination of the Releases and the February 22 Letter. The February 22 Letter, addressed from defendant Roark to plaintiff Allen, states in pertinent part:

> There has apparently been some confusion as to the method of calculation to be employed in determining the lump sum benefit under the Cluett Deferred Compensation Agreements. Some participants have told us that they were led to believe that a 5% discount rate would be used to determine lump sum values. This is incorrect.... The [discount rate] is 9.3%. Because of the confusion regarding the discount rate, we are giving you an opportunity to revoke the amendment and are enclosing an election form to revoke the [EPI Amendment] and are enclosing an election form which is to be used to affirm or revoke the [EPI Amendment].

*See* Affidavit of Frederick A. Brodie, Counsel for defendants, at Exhibit 2. The Releases gave plaintiffs the choice of ratifying the 9.3% rate or revoking the EPI Amendment altogether. The former would allow plaintiffs to receive a lump sum payout upon the event of a takeover, but a smaller payout than would have been received if the 5% interest rate was used. The latter would prevent plaintiffs from receiving any lump sum payout upon the event of takeover; if plaintiffs revoked the EPI Amendment they would not begin to receive any payouts of benefits under the EPI Program until age 65.

Plaintiffs argue that "the February 22 Letter misrepresented the applicable interest rate and failed to advise the EPI participants of material information regarding the timing and manner in which WestPoint had purported to reduce the lump sum payouts." Plaintiffs' Trial Memorandum at 2. Plaintiffs claim WestPoint solicited the Releases solely through the February 22 Letter, which "at best was an effort to slide the 9.3% discount rate by the EPI Participants without making too many waves and to gather a parcel of Releases in the bargain." *Id.* at 8.

## B. Claim for Constructive Fraud

■■■ Plaintiffs' action for constructive fraud fails because plaintiffs have not shown by clear and convincing evidence that defendants made a false representation of fact upon which they relied to their detriment. Plaintiffs assert that the February 22 Letter's representation that the applicable interest rate was 9.3%, as opposed to 5%, was false because the Cluett Committee lacked the authority to change that rate. *See* Plaintiffs' Trial Memorandum at 5. Plaintiffs also claim that defendant Dorsett made a false representation of fact on February 16, 1989 when he stated to Robert Krumme that the 5% interest rate had never been used to calculate a participant's benefits and that subsequently defendant WestPoint made false statements of fact to support Dorsett's statement. *See* Plaintiffs' Trial Memorandum at 9–11.

Neither of these arguments will sustain a claim of constructive fraud. The February 22 Letter makes no false representation. It

---

PV equals the present value of the future income, C is the amount of the income expected one year from now, and R is the annual rate of interest on C amount of money invested now. *See* R. Brealey & S. Myers, Principles of Corporate Finance 29–31 (4th ed. 1991) (explaining how to determine the value of assets that produce future income); Michael C. Thomsett, The Mathematics of Investing 30–31 (1989) (same).

As R *decreases*, the present value of the future income *increases*. Applying this principle to the instant case, one sees that as the discount rate decreases, the present value of the benefits owed to EPI participants increases. It is for this reason that plaintiffs seek to apply an interest rate of 5% and defendants argue that the applicable interest rate is 9.3%.

states that the 9.3% rate had been adopted for all WestPoint retirement benefit plans. Because the Cluett Committee had indeed adopted the 9.3% rate, that statement was true at the time it was made. Plaintiffs, of course, argue that defendants knew at the time that the Committee lacked the power to make this change. However, the record indicates that WestPoint management believed that if the Plan Actuary agreed that the 5% discount rate was outdated, unfair, and inconsistent with WestPoint's other pension plans, the Cluett Committee could adopt the 9.3% rate.[10] *See Allen,* 933 F.Supp. at 266 (finding that WestPoint management believed the Cluett Committee had the authority to adopt the 9.3% rate).

Similarly, neither Dorsett's alleged statement that the 5% rate had never been used to calculate a participant's benefits, nor WestPoint's allegedly false documentary support of that statement will sustain the constructive fraud claim. Whether or not these representations were false, there is no clear and convincing evidence that plaintiffs relied on them to their detriment. There is no evidence that Krumme informed plaintiffs of his interaction with Dorsett, or that Krumme informed plaintiffs of WestPoint's subsequent attempts to substantiate Dorsett's statement, before plaintiffs signed their respective Releases. In fact, plaintiffs' testimony at trial indicates that they did not even speak with Krumme before signing the Releases. Tr. at 514–517 (Allen); 605 (Moore); 646–48 (Mandry); 716–718 (Fornero); 842–45 (Pallotta); 860–61 (Matheson); 877–78 (Currier).[11] If plaintiffs did not rely on Dorsett's assertion and WestPoint's subsequent documentary support of that assertion in deciding whether to ratify the 9.3% rate, no claim for constructive fraud will lie.

## C. Negligent Misrepresentation

■ To succeed on their negligent misrepresentation claim, plaintiffs must first establish that the February 22 Letter and Releases constitute "carelessness in imparting words". *See* Part II(A). Plaintiffs argue that the February 22 Letter and Releases together failed to inform them clearly (1) that the rate incorporated into the original EPI Amendment had, mistakenly or not, been 5%; (2) of the Cluett Committee's decision to change the interest rate to 9.3%; (3) of the defendants' potential conflict of interest stemming from their efforts to reduce costs in order to participate in a leveraged buy-out of WestPoint; (4) that the change of interest rate would reduce the amount of benefits that plaintiffs would receive on change of ownership; and (5) that defendants had the option of challenging the 9.3% rate without forfeiting their right to a lump-sum payout upon change of control. *See* Plaintiffs' Trial Memorandum at 3–7, 11–12. Thus, plaintiffs' negligent misrepresentation claim rests as much on what defendants failed to disclose as it rests on what defendants actually said.[12]

■ Despite these arguments, I conclude that the combined effect of the February 22 Letter and the Releases did not constitute a negligent misrepresentation on the part of defendants. It was not misrepresentative to fail to inform plaintiffs that the applicable discount rate had always been 5%. The record indicates that defendants believed at all times that the EPI Amendment was intended to incorporate a 9.3% rate—which is to say, a discount rate that would cause the participants to receive the actual present value of their EPI benefits. *See Allen,* 933 F.Supp. at 269. Defendants have consistently maintained that the inclusion of the 5% discount rate by reference to the Cluett Pension Plan was a mistake. *See* Defendants' Trial Memorandum at 9–10. Thus, defendants' statements that the applicable discount rate was 9.3% was based on defendants' understand-

---

**10.** Although I invalidated the Cluett Committee's attempt to change that rate over six years later, this does not retroactively transform the February 22 Letter into a false representation of fact upon which plaintiffs may rest an action for constructive fraud.

**11.** Dunne did not testify at trial.

**12.** An action for negligent misrepresentation may be based on the omission of material information: "half of the truth may obviously amount to a lie, if it is understood to be the whole." *Prosser and Keeton on the Law of Torts* § 106 at 738 (5th ed. 1984).

ing of the EPI Agreement, and cannot be viewed as a misrepresentation.

Nor was it a misrepresentation to fail to explicitly inform plaintiffs that the 9.3% discount rate would reduce the amount of benefits EPI participants would receive upon a change of control, or that they had the option of challenging the 9.3% rate without forfeiting their right to a lump-sum payout. Plaintiffs are all sophisticated businessmen. As such, they are obliged under New York law to exercise ordinary diligence and to conduct an independent appraisal of their choices before entering into any business or legal transactions. *See Abrahami*, 638 N.Y.S.2d at 14. If plaintiffs did not understand the financial consequences of accepting the 9.3% rate, they should have sought the advice of an independent attorney or accountant before signing the Releases.

Additionally, defendants had no obligation to disclose the Cluett Committee's decision to "change" the discount rate to 9.3%. The record indicates that the Cluett Committee attempted to conform the relevant documents to the parties' original understanding regarding the discount rate to be used by the EPI Amendment. *See, e.g.*, Tr. at 913, 927–28 (Dorsett); Tr. at 1065–68 (Roark). As plaintiffs had already approved of the 9.3% rate when they signed the EPI Amendment, it is not reasonable to assume that knowledge of the Committee's action would have changed their decision to sign the Releases.

Nor were defendants obliged to inform plaintiffs of the possibility of a conflict of interest stemming from defendants' potential interest in a leveraged buy-out effort.[13] Plaintiffs allegation that defendants had a conflict of interest is not supported by "clear and convincing evidence". In theory, it is true that reducing WestPoint's outstanding expenses would make a leveraged buy-out more feasible by lowering the company's interest expense on any borrowed capital. Yet defendants have testified that they did not expect to derive any personal benefit from

adopting the 9.3% discount rate. *See* Affidavit of Frederick Brodie, Counsel for Defendants, Ex. 4 at 132 (Deposition of D. Michael Roark) ("Q: At the time when you decided that the EPI discount rate should be changed, did you have any idea of the order of magnitude of so-called savings from making the change? A: No.... Q: Did you gain anything in the change in the EPI discount rate? A: No."); *Id.*, Ex. 19 at 94–95 (Deposition of C. Powers Dorsett) ("Q: Mr. Dorsett, do you have any personal motive in any action you took with respect to changes in the EPI discount rate? A: No."). Plaintiffs have produced no evidence that casts doubt on the veracity of this testimony.

Additionally, Dorsett testified that no definite prospect of a management buy-out existed after February 1, 1989. *See id.*, Ex. 19 at 96. While it may be true that WestPoint's Board of Directors continued to search for a friendly buyer after that date, the evidence suggests that no concrete possibility of a leveraged buy-out existed by February 16, 1989, when the Cluett Committee adopted the 9.3% rate. *See* Affidavit of Robert J. Hausen, Counsel for Plaintiffs, Ex. I at A000219 (indicating that as of February 16, 1989, WestPoint Board of Directors anticipated that Merrill Lynch Capital Partners and the Wasserstein Perella/Blackstone Group would make a friendly tender offer, but also stating that "no agreements had been reached" at that point). *See also* Letter from Robert J. Hausen, Counsel for Plaintiffs, to Court, dated January 24, 1997 at 2–3 (setting forth chronology of WestPoint's contact with prospective bidders). I therefore find there was no actual leveraged buy-out under way after February 1, 1989, and conclude that defendants cannot be said to have had a conflict of interest merely because they were looking for a "white knight" that would acquire WestPoint and save their jobs. Accordingly, defendants had no obligation to inform plaintiffs that they had a potential conflict of interest.

---

**13.** Plaintiffs argue that WestPoint executives believed the success of a leveraged buy-out by a financial group with which they could participate depended on "drastic cost cutting measures." Plaintiff's Trial Memorandum at 7. Plaintiffs base their conflict of interest argument on the allegation that defendants deliberately adopted the 9.3% discount rate in an effort to cut costs and thereby effectuate a leveraged buy-out. *Id.*

### D. Fraudulent Omission

 The scienter requirement of a claim for fraudulent omission is equivalent to the scienter requirement for all common law fraud actions. *See Skrine*, 292 N.Y.S.2d at 276 (citing *Ochs v. Woods*, 221 N.Y. 335, 117 N.E. 305 (1917); *Smith v. Hedges*, 223 N.Y. 176, 184, 119 N.E. 396 (1918); *Reno v. Bull*, 226 N.Y. 546, 124 N.E. 144 (1919)). Plaintiffs may satisfy the scienter requirement of their fraudulent omission by a showing of "reckless indifference to error" or "a pretense of exact knowledge". *Id.* (quotations and citations omitted). Thus to succeed on a claim for fraudulent omission, plaintiffs must show by clear and convincing evidence that defendants were more than negligent in their failure to disclose material facts. *See Duggan v. Dep't of Motor Vehicles*, 31 A.D.2d 108, 295 N.Y.S.2d 706, 708–709 (1st Dep't 1968); *see also* Black's Law Dictionary 1271 (6th ed. 1990) ("Recklessness is a stronger term than mere or ordinary negligence"). Plaintiffs can succeed on their fraudulent omission claim only by showing that defendants knowingly or recklessly disregarded the risk of omitting material facts. The trial record does not support such a finding. There is no indication that defendants knowingly omitted material facts from either the February 22 Letter or the Releases. Nor is there clear and convincing evidence that defendants recklessly disregarded the risk that these two documents omitted material facts. Defendants are therefore not liable for fraudulent omission.

### IV. Res Judicata and the Preclusive Effect of the Releases

I address defendants' res judicata arguments in order to provide a fully adjudicated trial record from which the parties may appeal.

### A. Preclusive Effect of Releases

 Defendants maintain that the Releases this Court previously declined to rescind bar plaintiffs' instant claims. *See* Defendants' Trial Memorandum at 5 ("By accepting a 9.3% rate and releasing their claims under the EPI Program, the plaintiffs gave up any claim to a 5% rate.")

This argument misses the mark. Under New York law, a contract induced by misrepresentation or fraud is void. *See Gilbert v. Rothschild*, 280 N.Y. 66, 71, 19 N.E.2d 785 (1939). The contract itself, be it a Release or an amendment, cannot bar an action based on misrepresentation or fraud. *See Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 123 (2d Cir.1984). *See generally* Dan B. Dobbs, *Law of Remedies* § 9.1 at 544–545 (describing torts of negligent misrepresentation and fraud arising out of contracts); Restatement (Second) of Torts § 549 (damages for fraudulent misrepresentation).

 Nor are plaintiffs' present claims for damages barred by their previous rescission claim. It is settled law in New York that a party who was induced by misrepresentations to execute a contract of Release has three remedies from which to choose: (1) he may rescind the contract and sue in an action at law; (2) he may bring an equitable action to rescind the contract and in that action obtain full relief; and (3) he may retain what he has received under the fraudulent contract and bring an action at law to recover the damages sustained. *See Goldsmith v. National Container Corp.*, 287 N.Y. 438, 442–443, 40 N.E.2d 242 (1942). *See also duPont v. Perot*, 59 F.R.D. 404, 410 (S.D.N.Y.1973) (following and quoting *Goldsmith*). Under New York law, a party may pursue simultaneous actions for fraud, misrepresentation and rescission. *See* N.Y.Civ. Prac.L. & R. § 3002(e) (McKinney 1996).

### B. Defendants' Res Judicata Arguments

#### 1. Claim Preclusion by Res Judicata or Law of the Case

 Defendants contend that the doctrines of res judicata and the law of the case bar plaintiffs from relitigating the instant claims. *See* Defendants' Trial Memorandum at 1–4 (citing *Woods v. Dunlop Tire Corp.*, 972 F.2d 36, 38 (2d Cir.1992) (doctrine of claim preclusion bars all attempts to litigate issues that were or could have been litigated at a prior proceeding), *cert. denied*, 506 U.S. 1053, 113 S.Ct. 977, 122 L.Ed.2d 131 (1993)). These arguments are without merit as plain-

tiffs have always been prepared to litigate all their claims at one time. It was the defendants who requested that plaintiffs' claims be tried in two separate proceedings.

On December 11, 1995, the parties held a conference before the Court to discuss the unusual posture of this long-running case as it stood at that time. During that conference, Mr. Carling, Defendants' counsel, requested that the Court adjudicate the change of control issue, the mutual mistake issue and the question of attorneys' fees in a separate proceeding before reaching the instant misrepresentation issues. Mr. Carling stated two primary reasons for his request. First, his clients preferred to avoid the publicity of trial: "To avoid that spectacle of [defendants] being tried for fraud, the general counsel of [a] major public company being tried for fraud in front of a jury, we would like to see if it can be avoided by having the equitable trial first." Second, Mr. Carling stated that he believed proceeding in that manner would maximize the possibility of settlement. Transcript of December 11, 1995 Conference at 22–30.

I granted that request based on Mr. Carling's suggestion that such a bifurcation of the plaintiffs' case would increase the chances that the parties would settle their differences without resort to further litigation. It would be fundamentally unjust to allow defendants to defeat plaintiffs' claims now by raising res judicata and law of the case arguments. Despite defendants' arguments, nothing requires the Court to apply these doctrines to bar plaintiffs' fraud claims. *See Federated Dept. Stores, Inc. v. Moitie,* 452 U.S. 394, 401, 101 S.Ct. 2424, 2429, 69 L.Ed.2d 103 (1981) (doctrine of res judicata is not a technical rule, but rather a rule of fundamental and substantial justice); *In re PCH Assocs.,* 949 F.2d 585, 592 (2d Cir.1991) (law of the case doctrine is a rule of practice and not a limit on judicial authority). *See generally* 1B James W. Moore, Moore's Federal Practice ¶¶ 0.404[1], 0.405[1] (2d ed. 1996) (discussing function and underlying policies of res judicata and law of the case doctrines).

## 2. Collateral Estoppel or "Issue Preclusion"

■■■■■ The doctrine of collateral estoppel (also known as "issue preclusion") provides that when an action between two parties terminates in a valid judgment, a later action between the parties may be affected even though it involves a different claim. *See Levy v. Kosher Overseers Association of America, Inc.,* 104 F.3d 38, 40–41 (2d Cir. 1997) (citing *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979)). *See generally,* Eli J. Richardson, *Taking Issue with Preclusion: Reinventing Collateral Estoppel,* 65 Miss. L.J. 41, 44–53 (1995) (discussing the background and purpose of collateral estoppel law). As a result, findings of fact from prior proceedings in this case must apply to the resolution of plaintiffs' instant claims if (1) the facts of the prior proceeding and the instant proceeding are identical; (2) the findings of fact were actually litigated and decided in a prior proceeding; (3) there was a full and fair opportunity for litigation in the prior proceeding; (4) the fact was necessary to support a valid and final judgment on the merits. *See id.* Defendants argue that such findings of fact bar plaintiffs from bringing their instant claims. *See* Defendants' Trial Memorandum at 1–2; *see also* Oral Arg.Tr. at 23–24.

Specifically, defendants argue that the factual issues of whether defendants acted in good faith in attempting to change the discount rate, and whether plaintiffs suffered any harm as a result of the Releases, have already been adjudicated. *See* Oral Arg.Tr. at 24. Defendants rely on the following portion of the May 13 Opinion to support their collateral estoppel claim:

> The EPI Amendment was intended to give participants the actual present value of their benefits under the EPI Program. When WestPoint discovered that the Cluett Pension Plan's outdated 5% rate applied to the EPI Amendment, it made a good-faith effort to correct this drafting mistake. The fact that seven years later this Court determined that WestPoint's efforts were ineffective under ERISA is not proper grounds for rescission.... Re-

scinding the releases would create an entirely unfair result: WestPoint would be forced to pay the *Allen* Plaintiffs nearly twice the market-based present value of their EPI benefits. *See* Def.Ex. I. Such an outcome would undermine the WestPoint Board's understandable desire to harmonize the payout methodologies used in its various benefit plans. Moreover, it would provide the *Allen* Plaintiffs with an undeserved and unintended windfall.

*See Allen,* 933 F.Supp. at 268–269 (underlining added; italics in original).[14] If this Court has found that plaintiffs were not harmed by signing the Releases, that finding collaterally estops plaintiffs from bringing the instant common law claims: if plaintiffs cannot establish that they suffered harm as a result of signing the Releases, they have no viable common law claim.[15]

The question of whether plaintiffs' suffered a legally cognizable injury as a result of defendants' conduct must be determined within the context of the contractual relationship between the parties. It would appear at first blush that a fraudulently induced Release that reduced the dollar amount received by plaintiffs upon a change of control constitutes a legally cognizable "harm" sufficient to establish a *prima facie* case for constructive fraud, negligent misrepresentation or fraudulent omission. However, as noted above, the May 13 Opinion explicitly found that the EPI Amendment was intended to provide participants with the actual present value of their benefits under the EPI Program. The May 13 Opinion also found that using a 5% discount rate would have forced WestPoint to pay plaintiffs nearly twice the market-based present value of their EPI benefits. *See Allen,* 933 F.Supp. at 268.

I therefore held that using a 5% discount rate would be "an undeserved and unintended windfall." *Id.* Thus, plaintiffs were not harmed by use of the 9.3% discount rate because that rate satisfied the original intent of the parties—to provide EPI participants with the actual present value of their benefits upon a change of control.

█ This finding collaterally estops plaintiffs from asserting that they suffered a legally cognizable harm as a result of signing the Releases. The first three prongs of the collateral estoppel test are easily satisfied. First, plaintiffs' instant claims arise out of the same operative facts upon which they brought their action for rescission. Second, this issue has been actually litigated and decided. Third, there can be no question that plaintiffs have had a full and fair opportunity to litigate this issue at the prior proceeding—indeed plaintiffs do not assert otherwise. The only remaining requirement, therefore, is that the finding was necessary to support the judgment on the merits of the rescission claim. The finding that plaintiffs were not harmed by the implementation of the 9.3% discount rate led directly to my conclusion that "[t]he facts presented in this case do not justify rescission, which is a 'drastic' and 'extraordinary' remedy under New York law." *Allen,* 933 F.Supp. at 268. Accordingly, plaintiffs are collaterally estopped from bringing their common law claims because they may not assert that they were harmed by signing the Releases.

█ Defendants also argue that the May 13 finding that defendants acted in "good faith" in attempting to change the discount rate precludes plaintiffs from asserting here

---

**14.** The May 13 Opinion went on to state in a footnote: "At trial, the *Allen* Plaintiffs presented evidence of specific benefits—such as a restricted stock plan—contained in some WestPoint plans that were not available under the EPI Program. Tr. 968. They suggested that the 5% discount rate may have been intended to compensate for such differences. However, there is absolutely no evidence that the inclusion of the 5% rate was anything other than a mistake. Moreover, it is not clear that the benefit plans available to WestPoint's executives were more generous than those provided to Cluett's executives; indeed, Roark, who worked for both companies, testified

that the opposite was true. Tr. 1081, 1086." *Allen,* 933 F.Supp. at 269 n. 6.

**15.** Each of plaintiffs' common law claims requires plaintiffs to establish that they relied on defendants' allegedly fraudulent or misrepresentative statements or omissions *to plaintiffs' detriment.* Plaintiffs attempt to satisfy this element by showing that they signed the Releases as a result of defendants' misrepresentations and omissions, and that in turn by signing the Releases plaintiffs lowered the amount of EPI Benefits to which they were entitled upon a change of control. See Part III(A), *infra.*

that they negligently misrepresented material facts. "Good faith" is admittedly an ambiguous term that has been defined to mean, among other things, "an honest belief, the absence of malice and the absence of design to defraud or to seek unconscionable advantage". *Black's Law Dictionary* 693 (6th ed. 1990). Using this definition, it follows that one could act both "in good faith" and "negligently". Furthermore, this May 13 *dicta* did not constitute a ruling on whether the February 22 Letter and Releases constituted a negligent misrepresentation. Because the May 13 Opinion does not clearly find that defendants' "good-faith effort to correct its drafting mistake" included a reasonably diligent effort to inform plaintiffs of all material facts, defendants cannot successfully rely on it to collaterally estop plaintiffs from asserting that defendants acted negligently.

### V. Attorneys' Fees

The May 13 Opinion determined that plaintiffs are "entitled to be compensated by WestPoint for their costs and attorneys' fees". *Allen*, 933 F.Supp. at 270. However, in light of the extraordinary amount of judicial resources already consumed by this litigation, it makes no sense to calculate the exact amount of attorneys' fees owed at this stage. Defendants have announced their intention to challenge this Court's determination that they must pay plaintiffs' attorneys' fees. It would be inefficient to spend time calculating the exact amount of attorneys' fees owed if the appellate court concludes that defendants are not contractually obliged to reimburse plaintiffs for their attorneys' fees. *See* Fed.R.Civ.P. 58 (Advisory Committee Notes, 1993 Amendments) ("Particularly if the claim for fees involves substantial issues or is likely to be affected by the appellate decision, the district court may prefer to defer consideration of the claim for fees until after the appeal is resolved."). Nothing prevents the parties from appealing this Court's decisions regarding the merits of their claims at this time. *See Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 202, 108 S.Ct. 1717, 1722, 100 L.Ed.2d 178 (1988) ("[A]n unresolved issue of attorney's fees for the litigation in question does not prevent judgment on the merits from being final.");

*Farkas v. Rumore*, 101 F.3d 20, 22 (2d Cir. 1996) (*per curiam*) ("[W]here an order disposes of a party's substantive claims, but does not dispose of claims relating to attorney's fees, the time for appeal of the substantive claims starts to run from the date of the first order unless the district court explicitly grants a delay.") (citation to *Budinich* omitted). Accordingly, the amount of attorneys' fees and expenses to which plaintiffs are entitled will not be determined prior to any appeal.

### Conclusion

Plaintiffs have failed to show by clear and convincing evidence that defendants are liable for constructive fraud, negligent misrepresentation and fraudulent omission. Additionally, I find that plaintiffs are collaterally estopped from bringing these claims. Accordingly, it is hereby

ORDERED, DECREED and ADJUDGED that judgment be entered for defendants.

SO ORDERED.