THERMAL IMAGING, INC. and
Paul D. Holt d/b/a P.D.H.
Ltd., Plaintiffs,

v.

SANDGRAIN SECURITIES, INC. and
Elliot Marchant, Defendants.

Nos. 99CIV.11728(DC), 85977.

United States District Court,
S.D. New York.

Aug. 15, 2001.

Shayne & Greenwald Co., L.P.A., By Gary D. Greenwald, Esq., Columbus, OH, McElroy Deutsch & Mulvaney, By Joseph P. LaSala, Esq., New York, for Plaintiffs.

Lazare Potter Giacovas & Kranjac LLP, By Robert A. Giacovas, Esq., Michael T. Conway, Esq., New York, for Defendant Sandgrain Securities.

Mary Joseph Beck, Esq., Grove City, OH, for Defendant Elliot Marchant.

## OPINION

CHIN, District Judge.

In 1995, plaintiff Thermal Imaging, Inc. ("Thermal") decided to seek financing for an affiliated company, Computerized Thermal Imaging, Inc. ("CTI"). After a series of negotiations, Thermal entered into a loan agreement with Keystone Financial, Inc. ("Keystone"), a commercial lender specializing in loans secured by shares of stock. Under the terms of the agreement, Keystone agreed to loan Thermal $1,400,000 and Thermal "pledged" a certain amount of CTI stock as collateral. Thermal obtained the stock from plaintiff Paul Holt, a stock certificate was issued in Keystone's name, and the CTI shares (the "Pledged Shares") were deposited into Keystone's account at defendant Sandgrain Securities ("Sandgrain").

Keystone did not, however, fund the loan as required by the loan agreement. When pressed by Thermal representatives, Keystone made several small disbursements, but did not provide the full amount. Thermal became increasingly suspicious that Keystone was wrongfully selling the Pledged Shares, and eventually discovered that Keystone had sold more than 600,000 of the Pledged Shares that had been deposited in Keystone's account at Sandgrain.

Plaintiffs sued Keystone. Although they were successful in the lawsuit, they were unable to recover the Pledged Shares because Keystone apparently became insolvent. Plaintiffs thereafter brought the instant diversity action against Sandgrain and Elliot Marchant, the individual broker on the account, alleging breach of fiduciary duty, "assumed agency," fraud, and breach of implied contract. Defendants move for

summary judgment dismissing all claims, arguing, *inter alia,* that they owed no duty to plaintiffs with respect to the Pledged Shares.

Upon review of the evidence presented by the parties, I conclude that no reasonable jury could find defendants Sandgrain and Marchant liable for the improper sales of the Pledged Shares. If plaintiffs' allegations are true, then they were indeed harmed—but not by Sandgrain. Sandgrain had no duty, contractual or otherwise, to Thermal. It was not legally obligated to inform Thermal that sales of the Pledged Shares were taking place. In fact, it had an obligation to follow Keystone's instructions and complete whatever sales Keystone instructed it to make. Plaintiffs' recourse is against Keystone— not Sandgrain. The fact that Keystone is now apparently insolvent, while unfortunate, does not shift liability to Sandgrain.

For the reasons that follow, defendants' motion for summary judgment is granted and the complaint is dismissed.

### BACKGROUND

#### A. *Keystone and its Predecessor*

Keystone was incorporated in 1992, and became active in March 1995, when it acquired certain assets of First Financial, a company that specialized in funding stock-secured loans. (Deposition of Edwin D. Wood, II ("Wood Dep.") at 12, 64–65, 202; Deposition of Jacqueline Johnson ("Johnson Dep.") at 97–98). At the time, Keystone was owned by Edwin Wood, an indi-vidual serving time in federal prison for securities fraud who had served as "advisor" to First Financial. (Wood Dep. at 10, 13–15, 20–23, 27–28). Jacqueline Johnson, a sometime attorney for First Financial, became the company's president. (Wood Dep. at 22–23, 79; Johnson Dep. at 14). Like First Financial, Keystone made loans to individuals and businesses that were to be secured by shares of stock pledged as collateral. (Wood Dep. at 81–83; Johnson Dep. at 15). Despite his incarceration, Wood maintained regular contact with Johnson, who was supposed to receive instruction from him with respect to each loan. (Wood Dep. at 81).

In March 1995, Keystone opened an account at Sandgrain (the "Keystone Account"), into which First Financial transferred certain securities.[1] (Deposition of Paul Chinchar ("Chinchar Dep.") at 20–21, 25; Affidavit of Paul Chinchar ("Chinchar Aff.") ¶ 15). Johnson, Wood, and Janetta Hatfield, a Keystone employee who serviced the individual loans, retained authority over the Keystone Account.[2] (Chinchar Dep. at 24; Deposition of Elliot Marchant ("Marchant Dep.") at 47). The account was "non-discretionary," which meant that trades could only be made at Keystone's direction: in other words, Marchant, the broker on the account, could not sell stock without Keystone's authorization or refuse to comply with Keystone's order to sell. (Marchant Dep. at 103–04; Chinchar Aff. ¶ 15). Pursuant to Sandgrain policy, Marchant was also prohibited from sharing information about a client's account with anyone other than the client.[3] (*Id.* ¶ 19).

---

1. This was not the first time defendants came into contact with Keystone's principals. First Financial had also maintained an account at Sandgrain for which Marchant served as broker. (Wood Dep. at 51–52). Although the record is somewhat unclear, it appears that Sandgrain representatives, including Marchant, realized the nature of First Financial's business and were aware that its loans were secured by shares of stock. (Chinchar Dep. at 10–18).

2. Janetta Hatfield is Jacqueline Johnson's sister. (Johnson Dep. at 13).

3. In addition, either Johnson or Hatfield specifically instructed Marchant not to discuss

Despite his involvement with First Financial's and Keystone's accounts, Marchant claims that he never inquired as to the specifics of Keystone's business and thus did not realize the precise nature of Keystone's business (other than the fact that it "ma[de] loans"). Marchant further claims that he did not know that Keystone typically secured its loans with shares of stock. (Marchant Dep. at 44). Chinchar, on the other hand, understood, based on Marchant's representations, that Keystone, like First Financial, loaned money in exchange for securities. (Chinchar Dep. at 33–34). He was not told, however, until Thermal's complaints that the securities were pledged as collateral or restricted in any way. (Id. at 34–37).

## B.  *The Thermal/Keystone Loan*

Thermal, an Oregon corporation, develops and sells medical diagnostic devices used to detect cancer and other physiological disorders. (Affidavit of David B. Johnston ("Johnston Dep.") at 14–15). In 1988, Thermal transferred its diagnostic technology to CTI, a publicly traded company; Thermal eventually became CTI's largest shareholder. (Id. at 18–20, 25–26).

Thermal, through its president, David Johnston, decided to seek financing for CTI in early 1995.[4] To do so, it enlisted the services of Jim Forbes, a consultant to CTI who in turn sought help from another broker named Mike Heitz. (Johnston Dep. at 31–33, 38; Deposition of James R. Forbes ("Forbes Dep.") at 35–36, 39; Deposition of Michael E. Heitz ("Heitz Dep.") at 24). Through the efforts of Heitz, Thermal was put in contact with Keystone. (Forbes Dep. at 35–36; Heitz Dep. at 25).

Heitz first learned of Keystone through an ad in *Barron's* magazine and thereafter contacted the company about its stock loan program. (Id. at 26). In response to Heitz's inquiry, Jacqueline Johnson, the President of Keystone, proposed a loan transaction secured by shares of stock. (Id. at 26). Under the plan described by Johnson, Keystone would make a loan based on a percentage of a certain stock's market value, Thermal would pledge free-trading shares of that stock as collateral, and the shares—which were not to be sold unless Thermal defaulted on the loan— would be deposited in a brokerage account for safekeeping. (Id. at 36, 178–79; Johnston–Dep. at 46).

Thermal expressed interest, and in May 1995, began negotiating with Keystone for a $1,400,000 loan to be secured with free trading shares of CTI stock. (Heitz Dep. at 37–39; Johnston Dep. at 44–46). On July 19, 1995, representatives from Thermal and CTI met with Johnson to finalize the details. (Johnston Dep. at 41–43, 103). At the meeting, Johnston indicated his concern that the shares be held in a reputable brokerage, and eventually agreed to deposit the shares with A.G. Edwards, a brokerage he recognized as credible. (Heitz Dep. at 66–67; Johnston Dep. at 139–140). The parties then executed a series of documents, including a security and pledge agreement and a promissory note, setting forth the terms of the loan. (Declaration of Robert A. Giacovas ("Giacovas Decl."), Exs. D–E; Johnston Dep. at 41–43). By the terms of these documents, Thermal acknowledged receipt of $1,400,000 from Keystone and granted Keystone a security interest in 2,000,000

the Keystone Account with outside individuals. (Marchant Dep. at 104).

**4.**  Johnston was CEO of CTI and President of Thermal; Thermal sought financing on behalf

of CTI because CTI could not obtain a loan using its own stock as collateral. (Johnston Dep. at 14, 21–22, 26–30).

unrestricted shares of CTI .[5] (Giacovas Decl., Ex. D at 1, Ex. E at 1). At the time the documents were signed, Johnson specifically assured Johnston that the Pledged Shares would only be used as collateral and would not be sold. (Johnston Dep. at 107).

Because Thermal's own shares in CTI were restricted, Johnston arranged for Thermal to borrow 2,000,000 shares of unrestricted stock from plaintiff Paul Holt, a former consultant to Thermal.[6] (Johnston Dep. at 47, 58–59, 64–65; Deposition of Paul D. Holt ("Holt Dep.") at 14–16, 33–35). As Keystone had required, a stock certificate for the 2,000,000 shares was issued in Keystone's name. (Giacovas Decl., Ex. K; Johnston Dep. at 83; Johnson Dep. at 33–35). The certificate did not indicate that the shares were subject to any restrictions. (Giacovas Decl., Ex. K; Johnston Dep. at 79; Chinchar Aff. ¶ 12).[7]

For reasons that are somewhat unclear, A.G. Edwards refused to accept the 2,000,000 shares, and the parties had to choose another brokerage. (Forbes Dep. at 61–64, 67–69; Johnston Dep. at 134–39). Keystone suggested Sandgrain, and on or about August 17, 1995, the 2,000,000 Pledged Shares were deposited into the Keystone Account.[8] (Chinchar Aff. ¶ 11). Upon their deposit, the Pledged Shares

were transferred into "street name" to facilitate any potential sale (*i.e.*, upon default).[9] (*Id.*). The next day, Forbes attempted to obtain written confirmation from Keystone that the Pledged Shares had been received and were held subject to a security and pledge agreement. He did not receive a response. (Forbes Dep. at 74–75, 77). As further assurance, Forbes called Marchant to expedite the transaction.[10] (Forbes Dep. at 94, 171).

As Keystone's broker, Marchant was responsible for the day-to-day management of the Keystone Account. Sales orders were placed directly with him. (Marchant Dep. at 103; Chinchar Dep. at 44). Chinchar, on the other hand, had limited involvement with the account and knew little about the loan to Thermal. Because the Pledged Shares were placed in street name and the orders to sell were unsolicited, Chinchar did not need to approve any trades. (*Id.*). Moreover, Chinchar did not meet with any representatives of Keystone, nor did he receive any calls or correspondence from Keystone customers about their loans. (*Id.* at 38). With respect to the Pledged Shares, Chinchar was unaware of the loan agreement between Thermal and Keystone, and only knew what Marchant told him—that Keystone originally intended to "hold the stock," but

---

5. Despite these representations, Keystone had not, at the time the documents were signed, disbursed the loan funds to Thermal. Johnston was apparently aware of this discrepancy, but did not have any reservations about signing the document. (Johnston Dep. at 108–11).

6. Holt's shares originally bore a restrictive legend, but he had the legend removed. (Holt Dep. at 47).

7. Johnston did not have any concerns about putting the shares in Keystone's name, and did not consider the practice unusual. (Johnston Dep. at 96).

8. At about this time, Heitz performed due diligence on Sandgrain, obtaining a financial statement and verifying that it was in good standing with the NASD. (Heitz Dep. at 179). It is unclear whether this information was ever passed along to Thermal.

9. "Street name" refers to an account in the broker's name. Stocks are normally placed in "street name" to enable a quick and easy transfer. (Chinchar Aff. ¶ 11).

10. For his part, Marchant claims that he was not aware of the Pledged Shares being deposited or that they were pledged as collateral. (Marchant Dep. at 51–52).

later changed its mind and decided to sell.[11] (*Id.* at 40–42).

## C. *Shares Are Sold and Thermal Investigates*

Pursuant to the loan documents executed by the parties, Keystone was to fund the loan five days after the Pledged Shares were transferred into Keystone's account. (Johnston Dep. at 108). When Thermal had not received funding by early September, Forbes and Johnston became increasingly anxious about the status of the loan. Adding to their concern, Johnston and Forbes noticed that a high volume of trading was driving down the price of CTI stock.[12] (Forbes Dep. 77–78, 93; Johnston Dep. at 206). This led them to suspect that the Pledged Shares were in fact being sold.

Their suspicions proved correct. Between August 30th and September 29th, Keystone directed Marchant to sell 685,900 of the Pledged Shares.[13] (Giacovas Decl., Ex. I at 14–30 (Statements for August,

September, and October 1995); Chinchar Aff. ¶¶ 16–17).

Despite its early suspicions, Thermal did not immediately confirm the unauthorized sales. Forbes, who was never able to reach Jacqueline Johnson, spoke with Janetta Hatfield on numerous occasions throughout September 1995. (Forbes Dep. at 80–81, 121). During these conversations, Forbes repeatedly tried to find out why the money for the loan had not yet been disbursed and to determine whether Keystone was selling the Pledged Shares. (Forbes Dep. at 77–78; Deposition of Janetta Hatfield ("Hatfield Dep.") at 35–37). In response to his direct inquiries, Hatfield vehemently denied that Keystone was selling the Pledged Shares, and assured Forbes that they would "never do that." [14] (Forbes Dep. at 77–79, 93–94). She also explained that Keystone's difficulties in obtaining financing had delayed the funding of the loan. (*Id.* at 78–79). On September 7, 1995, and on several occasions thereafter, Keystone did wire sums of money to Thermal, totaling $687,000, with the expla-

**11.** Chinchar was, however, on notice as of July 1995 that Keystone had deposited, in the Keystone Account, stock pledged as collateral for other loans. At that time, Heitz had faxed a security and pledge agreement relating to Heitz's other loans to investigate his concerns that the shares securing these other loans were being improperly sold. Chinchar confirmed receipt of the fax. (Heitz Dep. 89–93).

**12.** Sometime in late August or September, Heitz also alerted Forbes to the possible improprieties in Keystone's funding of its loans. (Heitz Dep. at 131–35). Heitz experienced problems with Keystone in connection with two other loans; in July and August of 1995, Keystone was late funding or failed to fund certain loans and sold stock that had been pledged as collateral. (*Id.* at 122–30).

**13.** Despite plaintiffs' assertion that sales of the Pledged Shares occurred after September 29th, statements for the Keystone Account clearly indicate that the last sale of Pledged Shares took place on that date. A number of

sales were processed on October 3rd and 4th, but all were placed on or before September 29, 1995. (Giacovas Decl., Ex. I at 27; Ex. J (order tickets); Chinchar Dep. at 77–80; Johnston Dep. at 188).

It is unclear from the record who at Keystone actually directed Marchant to sell the Pledged Shares. (Marchant Dep. at 118).

**14.** Keystone's version of events is very different. According to Hatfield and Johnson, Keystone sold the Pledged Shares at Thermal's direction. (Hatfield Dep. at 36–40, 56, 76; Johnson Dep. at 69–70). Specifically, Hatfield claims that Forbes told her to sell the shares because Thermal needed money, and that, after checking with Johnson, she did as he asked. (Hatfield Dep. at 36–40, 56, 76). Hatfield also testified that she sent Forbes several faxes confirming the number of shares sold as per his request. (Hatfield Dep. at 55). All proceeds from the sale of the shares were purportedly turned over to Thermal. (Johnson Dep. at 70; Hatfield Dep. at 38).

nation that financing was still held up and that Keystone was transferring the money to Thermal as soon as it received it. (Forbes Dep. at 78–82; Johnston Dep. at 146–48).

Forbes also contacted Marchant about the sale of the Pledged Shares. During a phone call with Marchant on September 8, 1995, Forbes asked Marchant, point-blank, whether the Pledged Shares were being sold. (Forbes Dep. at 90–95). Marchant, who had previously acted very friendly toward Forbes, grew defensive and refused to discuss the matter with Forbes because he was not an "authorized person" on the Sandgrain account. (*Id.* at 94–95). He did not admit that shares had been sold. (*Id.* at 172). Forbes responded by telling Marchant "in no uncertain terms" that the CTI stock held in the Keystone Account was pledged as collateral for a loan and that any sale of the Pledged Shares would be illegal and fraudulent.[15] (*Id.* at 95, 164). Marchant's demeanor during the conversation increased Forbes's suspicions and led him to believe that sales were taking place. (*Id.* at 165–66). Although required by Sandgrain policy to report customer complaints, Marchant did not inform Chinchar of his conversation with Forbes, nor did he investigate Forbes's allegations.[16] (Marchant Dep. at 67, 70; Chinchar Dep. at 51).

Following the September 8th conversation with Marchant, Forbes felt "confident that [he] had to do something" about the Pledged Shares. (Forbes Dep. at 166).

Although increasingly suspicious, Forbes had continued to rely on Hatfield's repeated assurances that the Pledged Shares were not being sold. (*Id.* at 120–21, 125). Nevertheless, he did not immediately take further action because he felt he had to "have some proof before [he could] go calling someone a thief." (*Id.* at 97, 165–66). Instead, Forbes and Johnston obtained documents that allowed them to determine the source of the CTI shares being sold on the market. (Johnston Dep. at 218–220; Forbes Dep. at 97–98). Using these documents, they monitored the market for a couple of weeks. On September 27th, the position held by Keystone's clearing house in CTI dropped below 2,000,000 shares, thus confirming that Keystone had improperly sold the Pledged Shares. (*Id.* at 98, 102).

On Friday, September 29th, Forbes contacted Hatfield and told her he now had proof that Keystone had wrongfully sold the shares. (*Id* . at 109). Following that phone call—on either September 29th or October 2nd—Forbes called Chinchar to inform him about the sale of the Pledged Shares. (*Id.* at 110–111, 120). Over the course of that day, Forbes and Johnston sent a number of faxes to Sandgrain directing the brokerage to cease all trading of the Pledged Shares. (Forbes Dep. at 127–35; Giacovas Decl., Exs. O, P, Q (faxes)). Thermal also sent a fax to Merit Transfer (the transfer agent for CTI stock) requesting a stop transfer on CTI shares. (Johnston Dep. at 175–77; Forbes Dep. at 130–31).

---

**15.** Marchant disputes this version of events, and claims that even though he became aware at some point that the CTI stock was pledged as collateral, he did not know that the shares were not supposed to be sold. (Marchant Dep. at 44–45, 111). . According to Marchant, it was his understanding that Keystone could sell pledged stock so long as the shares were ultimately returned. (*Id.* at 110). He also claims that it was not unusual for pledged stock to be sold and replaced in this manner. (*Id.* at 112). Of course, for purposes of this motion, I have accepted Forbes's version of the events.

**16.** Marchant did inform Keystone of this conversation; he was told that Forbes had been given the information he sought. (Marchant Dep. at 122–23).

Chinchar only learned of the unauthorized sales as a result of his conversations and correspondence with Forbes on October 2nd. (Chinchar Dep. at 49–51, 109–110). Upon receipt of this information, Chinchar immediately spoke with Marchant, who told him, for the first time, about his phone call with Forbes on September 8th. (*Id.* at 56; Marchant Dep. at 74). Following this conversation, Chinchar directed Marchant to memorialize his account of the phone call.[17] (Chinchar Dep. at 57; Giacovas Decl., Ex. N). Chinchar also contacted Keystone to verify Thermal's allegations and requested and received, for the first time, a copy of the Security and Pledge Agreement between Thermal and Keystone. (Chinchar Dep. at 31, 116–17; Chinchar Aff. ¶¶ 13, 22). After concluding that Keystone had likely committed the breach alleged by Forbes, Chinchar informed Keystone that Sandgrain would not process any further trades, and that it had to transfer its account. (Chinchar Aff. ¶ 25). Within a month, Marchant "resigned" from Sandgrain. (Marchant Dep. at 37–38).

### D. *Prior Proceedings*

In December 1995, plaintiffs filed suit against Keystone and Johnson in the Southern District of Ohio seeking, *inter alia*, a court order directing Keystone to return the remaining Pledged Shares. A preliminary injunction hearing was held on December 28, 1995, at the conclusion of which the Court ordered, and Keystone consented to, the return of the remaining shares. The shares, however, were never returned. On March 30, 1999, plaintiffs voluntarily dismissed the Keystone Action, apparently because Keystone had become insolvent. The Pledged Shares were never returned to Holt. (Holt Dep. at 73).

Plaintiffs commenced the instant suit on January 28, 1999 in the United States District Court for the Southern District of Ohio. Defendants moved to transfer venue, and in December 1999, the case was transferred to this district. Plaintiffs filed an amended complaint on March 27, 2000.

This motion followed.

### *DISCUSSION*

Plaintiffs assert five causes of action against defendants in the amended complaint: (1) breach of fiduciary duty; (2) "assumed agency"; (3) "breach of fiduciary duty—privity"; (4) fraud; and (5) breach of implied or quasi-contract. Defendants move for summary judgment with respect to all claims. I address each cause of action.

### A. *Breach of Fiduciary Duty Claims*

As noted above, plaintiffs assert two claims for breach of fiduciary duty. In the first, plaintiffs allege that the circumstances surrounding the deposit of the Pledged Shares gave rise to fiduciary relationship with defendants, and that defendants breached that relationship by (1) failing to tell Thermal that the shares were being sold, (2) failing to conduct a "reasonable investigation" of Thermal's complaints, and (3) continuing to conduct sales of the shares after notice of Thermal's claims. (Am.Compl.¶ 55). In the second claim, plaintiffs allege that Keystone and defendants shared a fiduciary relationship with respect to the Keystone Account, and that this relationship extended to plaintiffs due to plaintiffs' privity with Keystone regarding the Pledged Shares deposited in

---

**17.** In the resulting document, Marchant stated that Forbes asked him questions about the Keystone account, and that he (Marchant) refused to divulge any details about the account. (Giacovas Decl., Ex. N).

the Keystone Account. (Am.Compl.¶ 66–69). For the reasons that follow, both claims are dismissed.

■ To succeed on a claim for breach of fiduciary duty in New York, a plaintiff must demonstrate the existence of a fiduciary duty between the parties and a breach of that duty by the defendant. *See Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp.,* No. 98 Civ. 6907(MBM), 2000 WL 335557, at *10, 2000 U.S. Dist. LEXIS 3941, at *31 (S.D.N.Y. Mar. 29, 2000). Under New York law, a fiduciary relationship may be found "when one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Flickinger v. Harold C. Brown & Co.,* 947 F.2d 595, 599 (2d Cir.1991) (quoting *Mandelblatt v. Devon Stores, Inc.,* 132 A.D.2d 162, 168, 521 N.Y.S.2d 672 (1st Dep't 1987)). The existence of a fiduciary relationship cannot be determined "by recourse to rigid formulas." *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.,* 767 F.Supp. 1220, 1231 (S.D.N.Y.1991), *rev'd on other grounds,* 967 F.2d 742 (2d Cir. 1992). Rather, "New York courts typically focus on whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first." *Id.* Mere reposal of one's trust or confidence in a party, however, does not automatically create a fiduciary relationship; the trust or confidence must be accepted as well. *Id.*

■ Here, the relationship between plaintiffs and defendants was far too attenuated to give rise to a fiduciary duty. To Sandgrain, Thermal was, at most, a client of a client; the two businesses engaged in no other direct transaction. (Chinchar Aff. ¶ 13). Sandgrain was not a party to the Keystone/Thermal loan agreement; in fact, the Pledged Shares were only deposited with Sandgrain after A.G. Edwards

refused to accept them. The Keystone Account was held in Keystone's name and only Keystone representatives were granted authority to make trades. Moreover, the stock certificate was issued in Keystone's name and it did not indicate that it was subject to any restrictions. In short, plaintiffs have produced no evidence to suggest that Thermal and Sandgrain shared a direct business relationship, let alone a fiduciary relationship. *See Breindel & Ferstendig v. Willis Faber & Dumas Ltd.,* No. 95 Civ. 7905(SHS), 1996 WL 413727, at *8, 1996 U.S. Dist. LEXIS 10432, at *19–20 (S.D.N.Y. Jul. 22, 1996).

Plaintiffs argue in their opposition papers that defendants' knowledge of the Pledged Shares somehow gave rise to an "implied fiduciary relationship" between Sandgrain and Thermal. (Pl. Br. at 17). This argument is rejected. Even if Sandgrain or its representatives did realize that the Pledged Shares were being held as collateral, this knowledge could not itself create a fiduciary duty on the part of defendants. While it is true that a "person who acquires special knowledge or information by virtue of a confidential or fiduciary relationship with another is not free to exploit that knowledge[,] ... the confidential relationship must predate the reposal of trust or confidence." *Litton Indus.,* 767 F.Supp. at 1232 (quoting *Diamond v. Oreamuno,* 24 N.Y.2d 494, 497, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969)) (emphasis omitted). In other words, "the relationship must inspire the disclosure"— it may not "merely emerge from the revelation's wake." *Id.* (quoting *United States v. Reed,* 601 F.Supp. 685, 715 (S.D.N.Y. 1985)). Accordingly, plaintiff's claim that this knowledge gave rise to an "implied fiduciary relationship" must be rejected.

Plaintiffs also argue that a fiduciary relationship was created because they justifi-

ably reposed their trust and confidence in Sandgrain with respect to the Pledged Shares. (Pl. Br. at 17). This contention is also without merit, for, given the circumstances, any such reposal of trust was entirely unjustified. Thermal had little contact with Sandgrain or Marchant prior to September 29th (only two or three phone calls from Forbes to Marchant), and certainly never informed Sandgrain that it expected the brokerage to act in its (Thermal's) best interests. Nor does the fact that Heitz performed "due diligence" compel a different conclusion: under plaintiffs' reasoning, a brokerage would owe a fiduciary duty to any individual who sought its financial statement or checked out its background with the NASD. Even if plaintiffs did place their trust in Sandgrain, it was not justified, and thus did not create any fiduciary obligations on the part of Marchant or Sandgrain.

■ Plaintiffs' second breach of fiduciary duty claim, premised on the relationship between Sandgrain and Keystone, must also be dismissed. To begin with, it is uncertain whether a fiduciary relationship even existed between Sandgrain and *Keystone*. As the Second Circuit has recognized, a broker/customer relationship ordinarily does not give rise to a fiduciary duty under New York law. *See Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940–41 (2d

Cir.1998). Accordingly, a fiduciary obligation will only arise "where the customer has delegated discretionary trading authority to the broker." *Id.; see also Liberman v. Worden*, 268 A.D.2d 337, 339, 701 N.Y.S.2d 419 (1st Dep't 2000). Absent such discretion, a broker's fiduciary duty extends only to those matters with which it is entrusted—namely, the completion of transactions. *See Press v. Chemical Inv. Servs. Corp.*, 988 F.Supp. 375, 386 (S.D.N.Y.1997). Because the Keystone Account was non-discretionary, Sandgrain did not have a fiduciary duty to Keystone with respect to the decision to make trades.

■ Even if, as Thermal alleges, Sandgrain had a fiduciary duty to Keystone with respect to the Pledged Shares deposited in the Keystone Account, such a duty did not extend to a third party in privity with Keystone. Plaintiffs cite no cases to support their novel legal theory that a fiduciary relationship between Sandgrain and Keystone could somehow extend to Thermal because it was in privity with one of the parties. This lack of support is understandable: if such a relationship were to exist, it would mean that a broker would owe a fiduciary duty to parties asserting claims adverse to the broker's own customers. Such a rule does not make sense; accordingly, the breach of fiduciary duty claim must be dismissed.[18]

---

**18.** To the extent that plaintiffs belatedly argue in their opposition papers that defendants "are liable for aiding and abetting Keystone in breaching its fiduciary duty to [plaintiffs]," the claim is also rejected. (Pl. Br. at 18). The breach of fiduciary duty claims asserted in the amended complaint are premised entirely on defendants' breach of their *own* fiduciary relationship with plaintiffs—not the fiduciary relationship between Keystone and plaintiffs. (Am.Compl.¶¶ 55, 70). Aiding and abetting a breach of fiduciary duty is a claim separate and distinct from breach of one's own fiduciary duty. *Compare Cromer Fin., Ltd. v. Berger*, 137 F.Supp.2d 452, 470 (S.D.N.Y.2001) (listing elements of aiding and abetting claim) *with Page Mill Asset Mgmt.*, 2000 WL 335557, at *10, 2000 U.S. Dist. LEXIS 3941, at *31 (listing elements of breach of fiduciary duty claim). As the amended complaint includes no "aiding and abetting" claim, plaintiff may not raise one now.

## B. *"Assumed Agency" Claim*

■ Plaintiffs next assert a cause of action for "assumed agency," alleging that defendants' knowledge of the Pledged Shares gave rise to an implied contract to "sell [the Pledged Shares] only in accordance with the interests" of plaintiffs and Keystone, and that, as a result of this "implied contract," defendants "assumed the duty to act as [p]laintiffs' agent for purposes of matters relating to the protection and security of the Pledged Shares." (Am.Compl.¶¶ 58–60). Plaintiffs further allege that following the assumption of this duty, defendants were obligated to "disclose [to plaintiffs] all material information ... concerning the security of the Pledged Shares," and that defendants breached this obligation by, *inter alia,* failing to tell Thermal the shares had been sold. This claim is also dismissed. (*Id.* ¶¶ 60–62).

Plaintiffs cite no authority for their novel "assumed agency" claim. This is not surprising, for "agency" is not itself a cause of action, but a means of imputing liability. To establish the existence of an agency relationship, a party must demonstrate (1) a manifestation by the principal that the agent shall act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will control the undertaking. *See Maung Ng We v. Merrill Lynch & Co.,* No. 99 Civ. 9687(CSH), 2000 WL 1159835, at *4, 2000 U.S. Dist. LEXIS 11660, at *11–12 (S.D.N.Y. Aug. 14, 2000) (citation omitted). In this case, there was neither a manifestation by the "principal" Thermal nor an acceptance of the undertaking by the "agent" Sandgrain. Thermal never informed Sandgrain or its representatives of the putative "agency" relationship, nor did Sandgrain ever indicate its assent. Because no reasonable jury could find that defendants "assumed" the role of agent, this claim must be dismissed.[19]

## C. *Fraud Claim*

■ Plaintiffs' next cause of action, alleging fraud, is based upon defendants' purported failure to disclose material facts relating to the wrongful sales of the Pledged Shares. For the reasons that follow, this claim must also be dismissed.

■ Although presented as a claim for fraud, plaintiffs' fourth cause of action is more properly considered a claim for fraudulent concealment. A plaintiff asserting a claim for fraudulent concealment under New York law must establish: (1) the defendant's failure to disclose material information that he had a duty to disclose; (2) the defendant's intention to defraud plaintiff thereby; (3) plaintiff's reasonable reliance upon the representation; and (4) plaintiff's damages resulting from such reliance. *See Bermuda Container Line Ltd. v. International Longshoremen's Ass'n,* 192 F.3d 250, 258 (2d Cir.1999) (internal citations and quotation marks omitted); *see also All Am. Adjusters v. Acceleration Nat'l Ins. Co.,* No. 96 Civ. 9344(MBM), 1997 WL 732445, at *7, 1997 U.S. Dist. LEXIS 18685, at *22 (S.D.N.Y. Nov. 24, 1997). With respect to the first element, a party's duty to speak may arise between parties to a business transaction in three situations:

---

19. Plaintiffs also assert that "[b]y depositing the shares, Thermal was clearly expressing its desire for Sandgrain to act in Thermal's best interest in keeping the [Pledged Shares] safe," and that by accepting the deposit, "Sandgrain undertook to act as Thermal's agent with respect to the shares." (Pl. Br. at 26). This contention is rejected. Even if Thermal was "expressing" such an intent, merely depositing the Pledged Shares (in Keystone's name and in Keystone's account) could not create an agency relationship.

where the party has made a partial or ambiguous statement[;] ... when the parties stand in a fiduciary or confidential relationship with each other; and ... where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.

*Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993) (internal citations and quotation marks omitted).

In this case, defendants did not have any duty to disclose information about the Pledged Shares to Thermal or Holt. As indicated above, the parties did not share a direct business relationship, much less a fiduciary relationship. Nor is there any indication that defendants made a partial or ambiguous statement to plaintiffs. More importantly, the parties were not engaged in or negotiating for any business transaction. Plaintiffs' reliance on Sandgrain's "superior knowledge" is thus misplaced: such a scenario only gives rise to a duty to speak among parties engaged in some type of transaction. *See, e.g., id.* Because the parties in this case were not engaged in any business transaction, defendants had no duty to disclose information about the Keystone Account to plaintiffs. Indeed, Sandgrain and its brokers had a duty *not* to disclose this information to unauthorized persons such as plaintiffs. (Chinchar Aff. ¶¶ 18–19).

The cause of action also fails because plaintiffs did not rely on the purported fraudulent concealment. The crux of plaintiffs' fraud claim is that, based on defendants' failure to speak, plaintiffs took no action with respect to the Pledged Shares and suffered damages as a result. This contention, however, is belied by the testimony of Jim Forbes. At his deposition, Forbes stated that his conversation with Marchant on September 8, 1995 "led

him to believe that [sales of the Pledged Shares] were, in fact, taking place." (Forbes Dep. at 165). Forbes further stated that the conversation enhanced his suspicions and that, after speaking with Marchant, he felt "confident that [he] had to do something." (*Id.* at 166). When questioned as to why he waited three weeks to take further action, Forbes attributed the delay to his reluctance to "make slanderous allegations." (Declaration of James Forbes ¶ 5).

Based upon this testimony, it is clear that plaintiffs did not rely on Marchant's alleged omissions. Marchant's failure to confirm Forbes's accusation did not lull Forbes into inaction; it actually confirmed his suspicions. The decision of Forbes (and Thermal) to wait did not result from any act or omission of defendants, but a general reluctance to take immediate action. While perhaps understandable, this decision cannot be attributed to defendants' purported fraudulent concealment. The fraud claim must therefore be dismissed.

### D. *Breach of Implied Contract Claim*

As their final cause of action, plaintiffs assert a claim for breach of implied or quasi-contract. Plaintiffs allege that defendants' knowledge of the Pledged Shares "gave rise to an implied, constructive or quasi-contract to sell and/or transfer [the] Pledged Shares only in accordance with ... Plaintiff[s'] Security and Pledge Agreement with [Keystone]." (Am. Compl.¶ 83). This claim, too, is dismissed.

Under New York law, a plaintiff seeking to recover under a theory of quasi-contract "must demonstrate that services were performed for the defendant resulting in [the defendant's] unjust en-

richment." *Kagan v. K–Tel Entertainment, Inc.,* 172 A.D.2d 375, 376, 568 N.Y.S.2d 756 (1st Dep't 1991). Significantly, "[i]t is not enough that the defendant received a benefit from the activities of the plaintiff; if the services were performed at the behest of someone other than the defendant, the plaintiff must look to that person for recovery." *Id.* (internal citation omitted).

The circumstances in this case do not give rise to a claim for quasi-contract. Thermal did not perform services for the benefit of Sandgrain; its transfer of the Pledged Shares into the Keystone Account took place pursuant to the Security and Loan Agreement with Keystone. If Thermal did perform any services here, it did so at the behest of Keystone, and it may not look to Sandgrain for recovery. Accordingly, the final cause of action must be dismissed as well.

### CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted, and the amended complaint is dismissed with prejudice and without costs. The Clerk of the Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.