**Richard DUMAS, Plaintiff,**

v.

**WYETH, Defendant.**

**No. 01 Civ. 11818(WCC).**

United States District Court, S.D. New York.

Sept. 19, 2003.

Law Offices of Perry S. Friedman, New York, Perry S. Friedman, Of Counsel, Attorneys for Plaintiff.

Hogan & Hartson, LLP, New York, David Dunn, Of Counsel, Attorneys for Defendant.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Richard Dumas brings the instant action against defendant Wyeth, his former employer, for fraudulent concealment.[1] Dumas, originally a union member, claims that Wyeth fraudulently concealed the change in benefits and employee status when it offered him a promotion to a management position, with the result that Dumas relinquished his rights under the collective bargaining agreement and became an "at will" employee. Wyeth now brings this motion for summary judgment pursuant to FED. R. CIV. P. 56.[2] For the reasons stated below, Wyeth's motion for summary judgment is granted.

## BACKGROUND

Dumas was employed at Wyeth's Pearl River facility[3] from November 1976 through his termination in August of 1997.[4]

---

1. The Stipulation of Dismissal of the Second Cause of Action for tortious interference with contract was so ordered by this Court on November 13, 2002.

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

3. The Pearl River facility has operated under several names since 1976. Dumas was origi-

nally hired by American Cyanamid Corporation, Lederle Labs Division, which was later acquired by American Home Products ("AHP") in 1995. After the filing of this action, AHP changed its name to Wyeth. (Def. Mem. Supp. Summ. J. at 2 n. 1.)

4. Dumas took a leave of absence after being seriously injured in an automobile accident in February of 1997 and was subsequently ter-

(Dumas Dep. at 41; Dumas Decl., Ex. C.) From 1978 to 1997, Dumas worked for the Liquids and Ointments Department (the "Department"). (Dumas Decl. ¶ 3.) Until 1996, Dumas was represented by and was a member of the International Chemical Workers Union, Local 143 (the "Union"). As a member of the Union, Dumas was covered under the collective bargaining agreement (the "CBA"), which provided that he could take a leave of absence for illness or injury for up to two years and six months without his service continuity being affected. (MacDonnell Decl., Ex 1.) In 1985, Dumas was out of work for two years as a result of injuries sustained in a serious car accident. (Dumas Decl. ¶ 4.) In addition there were occasions when he was placed on "light" or "limited" duty as a result of injuries that caused him to be temporarily unable to perform all of his normal tasks. (*Id.* ¶ 5.)

In the early 1990's Dumas held the position of "Operator Two" in the Department but expressed interest in becoming lead operator and began taking college courses to increase his chances of being promoted. (Dumas Dep. at 319.)

In 1995, Dumas was appointed to the lead operator position, part of the collective bargaining unit (the "CBU"), and much of the Department began to be phased out. (*Id.* at 60.) Dumas was later appointed as temporary supervisor of the Department and, after six months,[5] returned to his position as lead operator. (*Id.* at 61.) Robert Bracco, the manager

responsible for the Department, encouraged Dumas to bid for the permanent supervisor position, which Dumas acknowledged he knew was a management position and thus not part of the CBU. (*Id.* at 44, 86.) Dumas bid for the position, but claims that he never expected to get it. (*Id.* at 88.) In discussing the permanent position with Dumas, Bracco never mentioned any differences in benefits or the fact that, by accepting the position, Dumas would become an employee at will. (Bracco Dep. at 48, 56–58.)

Around January of 1996, Dumas was called into a meeting with Charles Hildebrand, the Manager of Consumer Products, Gary Muscarella, the then Manager of the Department, and Bracco, who had since received a new position. (Dumas Dep. at 93.) Dumas was informed that he had been approved for the permanent supervisor position but Dumas stated that he did not want the position due to various concerns. (*Id.* at 94.) Hildebrand and Muscarella then told Dumas that the position needed to be filled right away, and Dumas was the only one who had bid for it. (Dumas Decl. ¶ 23.) Additionally, because he was a member of the CBU, and had already served as temporary supervisor for six months, he could not be reappointed to that position until six months had elapsed. (*Id.*) Hildebrand and Muscarella then suggested that Dumas give the position a try.[6] (Dumas Dep. at 97.) Dumas stated that he did not want to sign any management employment agreements until he was sure that he wanted the posi-

---

minated when that leave ended in August of 1997. (Dumas Dep. at 6; Dumas Decl., Ex. C.)

**5.** The CBA provides that a union member can be promoted to a temporary supervisor position for up to six months while remaining in the CBU. (MacDonnell Decl., Ex 1.)

**6.** Whether Dumas was assured he could return to his position as a temporary supervisor

if it turned out he did not want to continue as a permanent supervisor is unclear. In his deposition, Dumas states that his question of whether he could get his old job back was never answered, while his declaration states that he was assured he could return to the temporary supervisor position. (Dumas Dep. at 97–99; Dumas Decl. ¶ 24.)

tion on a permanent basis, and Hildebrand and Muscarella agreed. (Dumas Decl. ¶ 25.) Dumas believed that he was taking the supervisor position on a trial basis and that it would not become permanent until he signed such an agreement. (*Id.* ¶ 28.)

Dumas requested a meeting to discuss benefit changes, policies and training and in February 1996, Dumas met with Arlene MacDonnell, a benefits specialist at Wyeth. (Dumas Dep. at 108.) At this time, all Wyeth employees were switching their benefits because AHP had bought the company. (MacDonnell Decl. ¶ 5.) However, Dumas was the only employee who met with MacDonnell who was not only switching benefits because of the new owner, but also switching from the CBU to management. (MacDonnell Dep. at 29.) Dumas was given numerous forms to sign at this meeting, but was under the belief that they pertained to the switch over to AHP, and not to his new position as permanent supervisor. (Dumas Dep. at 163.) The purpose of the meeting was to discuss the differences between the benefits offered to management and the benefits offered to union members. (MacDonnell Dep. at 13–14.) However, during this meeting, Dumas did not inquire whether and MacDonnell did not inform Dumas that, by becoming a management employee, he would become an employee at will and would give up his seniority rights, that his vacation would be calculated in a different manner, and that instead of having thirty months for reinstatement after disability leave, he would have only twenty-six weeks. (Pl. Rule 56.1 Stmt. ¶¶ 39–41.) MacDonnell asserts that it was not her responsibility to discuss his employee status or seniority rights. (MacDonnell Dep. at 24.)

About a week later, Muscarella instructed Dumas to go to Human Resources and sign an agreement not to compete, stating that the purpose of such agreement was to prevent Dumas from taking company secrets if he left Wyeth. (Dumas Decl. ¶ 35.) Neither Muscarella nor Human Resources personnel informed Dumas that by signing the agreement he would be affirming that he knew he was employed at will or that the agreement was an employment agreement. (*Id.*) Shortly thereafter, Dumas informed Muscarella that he was unhappy and wanted to return to his position as lead operator, but Muscarella told Dumas that there was no job to go back to and Dumas should give it more time. (Dumas Dep. at 129.) Dumas continued in his position as permanent supervisor.

On February 1, 1997, Dumas sustained serious injuries in an automobile accident. (Dumas Dep. at 6.) After the twenty-six week period available to management employees lapsed, and Dumas was still unable to return to work, his employment was terminated on August 4, 1997. (Dumas Decl. ¶ 38.) Thereafter, in 1998, Dumas's physicians and Social Security concluded that Dumas was capable of doing sedentary work. (Pl. Rule 56.1 Stmt. ¶ 52.) During an unrelated mediation proceeding in late 1998 or early 1999, Dumas inquired through his attorney whether he could return to work and perform "light" duty. (Dumas Dep. at 196.) After his attorney conferred with counsel for AHP, Dumas was informed that AHP considered that it was not a good time to take him back. (*Id.* at 199.)

Dumas remained unable to return to his job as permanent supervisor until January 2000 at the earliest, more than thirty-five months after his leave began. (*Id.* at 285.) Dumas did not seek other employment until the summer of 2002, more than five years after the accident. (*Id.* at 277.) Throughout Dumas's leave of absence, he continued to receive disability payments pursuant to Wyeth's plans, and continued

to request tuition reimbursements. (Dumas Decl. ¶ 42.)

Dumas now brings this fraudulent concealment action against Wyeth for failing to inform him that his promotion to permanent supervisor would make him an "at will" employee, that he would lose his seniority rights, that his vacation would be calculated in a different manner and that instead of having thirty months for reinstatement after disability leave, he would only have twenty-six weeks.

## DISCUSSION

### I. *Summary Judgment Standard*

Under FED. R. CIV. P. 56, summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant for a reasonable jury to return a verdict in his favor. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S.

574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994).

### II. *Fraudulent Concealment*

■ A plaintiff asserting a fraudulent concealment claim under New York law must establish: 1) the defendant's failure to disclose material information that it had a duty to disclose; 2) the defendant's intention to defraud plaintiff thereby; 3) plaintiff's reasonable reliance upon the representation; and 4) plaintiff's damages resulting from such reliance. *Thermal Imaging, Inc. v. Sandgrain Sec., Inc.,* 158 F.Supp.2d 335, 345 (S.D.N.Y.2001). We conclude that even if Wyeth had a duty[7] to disclose certain material employment information and even if that information was in fact material, Dumas did not rely on the absence of information when making his decision to accept the promotion, nor did Wyeth intentionally withhold this information.

### A. *Reliance*

■ A plaintiff shows reliance by demonstrating that he was induced to act or refrain from acting to his detriment because of the alleged omission. *Shea v. Hambros PLC,* 244 A.D.2d 39, 673 N.Y.S.2d 369, 374 (N.Y.App.Div.1998). Wyeth contends that there is no evidence that Dumas relied on the absence of information and in fact points to Dumas's deposition where he testifies that his re-employment rights were not important to him until he became disabled and it was not something he was thinking about at the

---

7. Plaintiff contends that a duty existed based on the employer-employee relationship of confidence and trust. Wyeth does not dispute that a duty existed, but does contest the materiality of the information. (Pl. Mem. Opp. Summ. J. at 13; Def. Mem. Supp. Summ. J. at 11.)

time of the promotion. (Dumas Dep. at 194.) In addition, Wyeth argues that if Dumas did rely on the omission, such reliance was not reasonable because he had many opportunities to question Wyeth about his benefits and employment status, but never chose to do so. (Def. Mem. Supp. Summ. J. at 18.)

Dumas argues that had he known there were differences in the benefits, such as a much shorter amount of time for disability leave and re-employment, he would never have taken the job and that he relied on Wyeth's silence on these issues. (Pl. Mem. Opp. Summ. J. at 23.) After inquiring about meeting with someone to explain his new rights, Wyeth set up a meeting for Dumas to meet with MacDonnell, the benefits specialist. However, Dumas argues, MacDonnell never explained issues of job security and reinstatement rights, nor the difference in vacation benefits. (Pl. Rule 56.1 Stmt. ¶¶ 38–41.)

While the reasonableness of reliance is generally an issue to be resolved at trial, we find there are no issues of fact as to whether Dumas ever relied on the omission. Dumas stated in his deposition that his re-employment rights were not important to him at the time of the promotion, and that they only became important to him when he became disabled in February of 1997. (Dumas Dep. at 194.) Further, a meeting was set up with the benefits specialist to discuss the change in Dumas's benefits after being promoted. Dumas had plenty of opportunity to ascertain the omitted information (information that was so important, Dumas claims, that he would not have accepted the promotion had he known those benefits would change) during that meeting or at any point by questioning Hildebrand, Muscarella, Bracco or even a union representative. *Waksman v. Cohen,* No. 00 Civ. 9005, 2002 WL 31466417, at *6 (S.D.N.Y. Nov.4, 2002) (citing New York law, "[w]here a party has the means to discover the true nature of the transaction by the exercise of ordinary intelligence and fails to make use of those means, he cannot claim justifiable reliance on defendant's misrepresentations.").[8] Dumas cannot claim fraudulent concealment now when relatively little effort then would have revealed that his benefits changed.

However, even if Dumas reasonably relied on the omissions, it is clear that Wyeth never intended to fraudulently conceal information and that summary judgment is therefore appropriate.

### B. *Scienter*

■ Summary judgment is generally inappropriate where there are questions of motive and intent, "nevertheless it remains incumbent upon the party opposing summary judgment to establish a factual predicate from which it can be determined as a matter of law, that a genuine issue of material fact exists." *Jaser v. Fischer,* 65 Conn.App. 349, 783 A.2d 28, 35 (2001).[9]

■ Wyeth argues that Dumas has not shown that Wyeth knew he was acting on

---

8. Dumas argues that the cases applying this law only involve sophisticated businessmen, and should therefore not apply to him. While it is true that the cases Wyeth cites and the case above involve sophisticated businessmen, we think they are applicable to this situation. While Dumas may not be a sophisticated businessman, he had been a union member for 20 years and as such should have known the basic differences in employee status and at the very least should have known to ask about

these differences. *See United States v. Hayes,* 207 F.Supp.2d 944, 950 (S.D.Iowa 2002) (finding that criminal plaintiff's extensive involvement in the criminal system placed him in a position equivalent to a sophisticated businessman with respect to knowing about his rights at trial).

9. Dumas argues that the standard for finding that a fraudulent omission is deliberate is "when there is a duty to disclose the informa-

any omitted information much less that it intended to defraud Dumas by concealing information. (Def. Mem. Supp. Summ. J. at 13–14.) Wyeth argues that it did not know Dumas was acting under a mistaken belief because Dumas never asked anyone about his seniority rights, even though he knew that the Department was being phased out, and when given the opportunity to meet with and ask the benefits specialist, MacDonnell, about the change in benefits, he never did. (*Id.*) Additionally, Wyeth emphasizes that Dumas signed an agreement not to compete, which expressly provided that his employment could be terminated at any time without notice. (*Id.* at 14.)

Further, Wyeth contends that there is no evidence that it intended to defraud Dumas by "tricking" him into taking the permanent supervisor position because Dumas, on several occasions, told Wyeth that he was interested in being promoted. In fact, Wyeth points out, this is what Dumas represented to Wyeth when applying for tuition reimbursement. (Dunn Decl., Ex 1.) The application for educational assistance filled out by Dumas on May 5, 1994 states under the heading "Relation of Course(s) to Present or Expected Assignments" that the "[c]ourse of study will help to advance into other positions in the company, i.e. management." (*Id.*) Thus, Wyeth contends, it had no motive to "trick" Dumas into accepting the perma-

nent supervisor position because so far as Wyeth knew, Dumas wanted a promotion to a management position.

Dumas contends that because he was a union member for twenty years he was unfamiliar with policies regarding management employees. (Pl. Mem. Opp. Summ. J. at 17.) In addition, Dumas thought that management and union members had the same benefits because that was his understanding when Wyeth was owned by American Cyanamid. (Dumas Dep. at 111.) He therefore did not know to ask about the differences in benefits and employment status because he did not think there were any and, in the meeting set up by Wyeth with MacDonnell for the express purpose of explaining the differences in benefits, the only benefits discussed were a savings plan, dental plan, and sick day leave. (MacDonnell Dep. at 16, 19, 22.) Further, Dumas claims that he was assured by Bracco that bidding for the position "can't hurt" and he was never told by anyone that his benefits or employee status would change. (Dumas Dep. at 212; Bracco Dep. at 48.) Moreover, Dumas thought that the promotion would be on a trial basis such that he could return to his old job if it turned out that he did not like the permanent supervisor position. (Dumas Dep. at 99.) Dumas continues to argue that Wyeth specifically did not inform him of the benefits and status change because they needed someone to fill the

---

tion based on superior knowledge of information not available to the other party." (Pl. Mem. Opp. Summ. J. at 19 citing *Koncelik v. Abady*, 179 A.D.2d 942, 944, 578 N.Y.S.2d 717 (N.Y.App.Div.1992).) The *Koncelik* court does state that "nondisclosure is tantamount to an affirmative misrepresentation where a party to a transaction is duty-bound to disclose certain pertinent information," but only as an acknowledgment that a claim for fraudulent omission is a permutation of the common law action for fraud. *Koncelik*, 179 A.D.2d at 944, 578 N.Y.S.2d 717 (quoting *Callahan v. Callahan*, 127 A.D.2d 298, 300,

514 N.Y.S.2d 819 (N.Y.App.Div.1987)); *Allen v. Westpoint–Pepperell, Inc.*, 11 F.Supp.2d 277, 284 (S.D.N.Y.1997). Accordingly, intent is a separate element of a fraud claim and is not presupposed merely because a duty existed. *Fidenas AG v. Honeywell, Inc.*, 501 F.Supp. 1029, 1039 (S.D.N.Y.1980) ("Knowledge of fraud, however, is not fraud. Nor is mere silence. Fraudulent concealment requires knowledge, a relationship between the parties that creates a duty to disclose, and intent to deceive and defraud by nondisclosure.").

permanent supervisor position[10] and no one else was qualified.

Based on the above, we find there are no issues of fact as to Wyeth's intent. Dumas had represented to Wyeth that he wanted the promotion to management, he signed an agreement not to compete that stated his employment could be terminated at any time and he met with Wyeth's benefits specialist and chose not to inquire about benefits that he claims were important in his decision making process. A rational jury could not find that Wyeth intentionally deceived Dumas.

### CONCLUSION

For the reasons stated above, Wyeth's motion for summary judgment is granted.

SO ORDERED.

---

10. Dumas had been temporary supervisor for six months and, according to the CBA, anoth- er six months would have to pass for him to be eligible for reappointment as temporary supervisor. (MacDonnell Decl., Ex 1.)